627 F.2d 1313
 201 U.S.App.D.C. 327
 AMERICAN TRUCKING ASSOCIATIONS, INC., Petitioner,*
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents *.
Common Carrier Conference-Irregular Route, National
Industrial Traffic League et al., Steere Tank Lines, Inc. et
al., Chemical Leaman Tank Lines, Inc., Motor Carrier Lawyers
Association, Colonial Fast Freight Lines, Inc. et al., J. H.
Rose Truck Line, Inc. et al., International Brotherhood of
Teamsters et al., and Michigan and Nebraska Transit Co.,
Inc., Intervenors.
 No. 78-2260.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 24, 1980.
Decided April 24, 1980.
 
 Petitions for Review of a Decision of the Interstate Commerce commission.
 Alan J. Thiemann, Washington, D.C., with whom Nelson J. Cooney and Kenneth E. Siegel, Washington, D.C., were on the brief, for petitioner American Trucking Associations, Inc.
 Ronald J. Mastej and Rex Eames, Detroit, Mich., were on the brief for petitioners Motor Carriers Central Freight Association et al.
 Alan E. Serby, Clyde W. Carver, and John J. Capo, Atlanta, Ga., were on the brief for petitioners Refrigerated Transport Co., Inc. et al.
 H. E. Miller, Jr., Chesterton, Ind., was on the brief for petitioner Sawyer Transport, Inc.
 John P. Fonte, Atty., I.C.C., Washington, D.C., for respondents. Mark L. Evans, Gen. Counsel, Frederick W. Read, III, Associate Gen. Counsel, and Kenneth P. Kolson, Atty., I.C.C., and John J. Powers, III and William D. Coston, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. Robert B. Nicholson, Barry Grossman, and Bruce E. Fein, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondent United States.
 Richard H. Streeter, Washington, D.C., for intervenors International Brotherhood of Teamsters et al. Edward K. Wheeler and Chandler L. van Orman, Washington, D.C., also entered appearances for intervenors International Brotherhood of Teamsters et al.
 Renee D. Rysdahl, Washington, D.C., with whom John F. Donelan, Washington, D.C., was on the brief, for intervenor National Industrial Traffic League.
 Harry J. Jordan, Washington, D.C., was on the brief for intervenor Common Carrier Conference-Irregular Route.
 Leonard A. Jaskiewicz and Edward J. Kiley, Washington, D.C., were on the brief for intervenor Chemical Leaman Tank Lines, Inc.
 Hugh T. Matthews, Dallas, Tex., was on the brief for intervenors Steere Tank Lines, Inc. et al.
 Peter A. Greene, New York City, was on the brief for intervenor Motor Carrier Lawyers Association.
 E. Stephen Heisley and Elizabeth A. Purcell, Washington, D.C., were on the brief for intervenors Colonial Fast Freight Lines, Inc. et al.
 Mert Starnes, Austin, Tex., was on the brief for intervenors American Transfer and Storage Co. et al. (No. 79-1105).
 James M. Doherty was on the brief for intervenors J. H. Rose Truck Line, Inc. et al.
 Steven H. Loeb entered an appearance for intervenor Michigan and Nebraska Transit Co., Inc.
 Before WRIGHT, Chief Judge, and McGOWAN and MIKVA, Circuit Judges.
 Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Chief Judge:
 
 
 1
 These consolidated petitions for review[1] challenge regulations recently promulgated by the Interstate Commerce Commission (ICC or Commission) governing intervention in motor carrier licensing proceedings by persons opposing issuance of the license.[2] Petitioner American Trucking Associations, Inc., the national organization of the trucking industry, is joined by other motor carrier interests and by intervenor International Brotherhood of Teamsters in asking this court to strike down the regulations.[3] They contend that the regulations restrict the right of intervention in ICC licensing proceedings guaranteed to competitors and carrier employees under the Interstate Commerce Act, 49 U.S.C.A. §§ 10306(b), 10328(a) & (b) (1979), the Administrative Procedure Act, 5 U.S.C. §§ 544(c), 556(d) (1976), and the Due Process Clause. They also argue that the regulations are arbitrary, capricious, without rational basis, and abusive of discretion.
 
 
 2
 The Commission, joined by intervenor National Industrial Traffic League, an organization of shippers, argues that the challenged regulations are within the discretion of the agency, being a reasonable way to control the docket and restore order and manageability to licensing proceedings. The Commission denies that the regulations will take from any party a right of intervention it may have under the relevant statutes or the Constitution. The Commission observes that the new regulations are similar to the procedures governing intervention in licensing proceedings conducted by other federal agencies.
 
 
 3
 We agree with the Commission that the new rules are within its statutory authority and, being a sensible method of improving and streamlining ICC licensing proceedings, are not arbitrary, capricious, or abusive of discretion. We therefore affirm.
 
 
 4
 * Until the challenged regulations went into effect[4] the ICC permitted any person to file a protest to a motor carrier application and to participate in the proceeding without making any showing of interest.[5] In his 1958 treatise on administrative law Professor K. C. Davis commented on the uniquely open intervention rules of the ICC:
 
 
 5
 (T)he ICC almost as a matter of course grants petitions for leave to intervene, with no inquiry except into the timeliness of the petitions and the question of undue broadening of issues. Moreover, in nearly any proceeding except a complaint case, one may become a party by merely entering an appearance without filing a petition for leave to intervene. The ICC thus avoids problems about adequacy of legal interest or right. Even a substantial broadening of the issues is commonly permitted.
 
 
 6
 1 K. Davis, Administrative Law Treatise § 8.11 at 569-570 (1958) (footnotes omitted).
 
 
 7
 Recently, however, the ICC has experienced an "influx of applications,"[6] which has caused a substantial backlog.[7] In the Commission's estimation, this backlog has reached the point at which the agency can no longer be "as responsive as it could be" to the requirements of the transportation industry and the interests of the public.[8] Accordingly, on June 2, 1977 the Commission established a staff task force to investigate ways of improving outmoded ICC procedures. After study the staff concluded that the ICC should grant standing to protest license applications "only to carriers actually participating in the involved traffic during the 2-year period preceding the filing of the application."[9] By this change in procedure the staff expected to eliminate many "frivolous protests" and to permit more cases to be handled as unopposed.[10]
 
 
 8
 After inviting comments on the staff report[11] the Commission published proposed rules restricting the right of intervention in motor carrier licensing proceedings[12] and set the matter for notice and comment rulemaking without oral argument. The proposed rules were much less restrictive than those supported by the staff report.[13] In summary, they permitted automatic intervention by carriers in direct competition with the applicant's proposed service and permissive intervention by other parties upon petition. The Commission was to base its decision whether to grant such permissive intervention on seven criteria designed to identify parties with sufficient interest in the proceeding to warrant their participation. Many members of the public and some federal agencies submitted comments on the proposed rules. Carrier interests generally agreed that the Commission should take action to eliminate frivolous protests, but opposed the proposed rules on the ground that they would interfere with the ability of carriers with competing authority to protect their economic interests.[14] Shipping interests and the federal agencies generally supported the proposed rules or suggested that they be strengthened so as to restrict the right of intervention still further.[15]
 
 
 9
 On November 1, 1978 the ICC promulgated final rules governing intervention in motor carrier licensing proceedings. Protest Standards in Motor Carrier Application Proceedings (1978), printed at 43 Fed.Reg. 50908 (November 1, 1978), Deferred Appendix (DA) 28. The new rules amend 49 C.F.R. § 1100.247(i) (1978) and add new subsections (e)(9), (k), (l), and (m). Under the new intervention rules the ICC will permit intervention as a matter of right in motor carrier licensing proceedings to persons supporting the application, and to any carrier that submits a petition showing that it:
 
 
 10
 (1) Is authorized to perform any of the services which the applicant seeks authority to perform(;) and
 
 
 11
 (2) Has the necessary equipment and facilities for performing that service; and
 
 
 12
 (3) Has performed a service within the scope of the application either (i) for those supporting the application, or, (ii) where the service is not limited to the facilities of particular shippers, from and to or between any of the involved points.
 
 
 13
 Protest Standards, supra, 43 Fed.Reg. at 50911, DA 52, 49 C.F.R. § 1100.247(k) (1979). Other parties may petition to intervene in motor carrier licensing proceedings, although they do not satisfy the criteria of subpart (k). The Commission will decide whether to permit such intervention, based on the following factors:
 
 
 14
 (i) The nature, if any, of the petitioner's right under a statute to be made a party.
 
 
 15
 (ii) The nature and extent of the property, financial, or other interest of the petitioner, including petitioner's service capabilities and the extent, if any, to which petitioner (A) has solicited the traffic or business of those supporting the application, or, (B) where the identity of those supporting the application is not included in the published application notice, has solicited traffic or business identical to any part of that sought by applicant within the affected marketplace.
 
 
 16
 (iii) The effect of the decision which may be rendered upon the petitioner's interest.
 
 
 17
 (iv) The availability of other means by which the petitioner's interests might be protected.
 
 
 18
 (v) The extent to which the petitioner's interest will be represented by other parties.
 
 
 19
 (vi) The extent to which the petitioner's participation may reasonably be expected to assist in the development of a sound record.
 
 
 20
 (vii) The extent to which participation by the petitioner would broaden the issues or delay the proceeding.
 
 
 21
 Id., DA 53-55, 49 C.F.R. § 1100.247(l ) (1979). The Commission may also take into account other factors important to individual cases. Persons denied permission to intervene may take an immediate appeal from that denial within the agency[16] and, if necessary, to the Court of Appeals.[17] The new intervention rules went into effect on March 1, 1979.[18]
 
 II
 
 22
 Our task is to decide whether the new regulations on their face violate the relevant statutes or the Constitution. To the extent that petitioners are arguing that the Commission is likely to abuse or misapply the new standards so as to deny intervention to persons with a right to intervene, the issue is not ripe for judicial review. See Toilet Goods Ass'n, Inc. v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). If any person is wrongfully denied permission to intervene, he has the right to appeal within the agency and then to the Court of Appeals. Such an individual case is not now before this court.[19] Rather, we must determine whether, on a normal and fair interpretation of the new regulations, and given the usual presumption of legality of agency action, persons with the right to intervene under the applicable statutes will be denied that right.
 
 
 23
 * The Interstate Commerce Act and the Administrative Procedure Act permit intervention by "interested persons"[20] or "all interested parties."[21] The constitutional guarantee of due process of law also serves as a basis for a right to be heard by persons whose property or liberty interests are invaded by agency action.[22] The concept of "interest" in the Interstate Commerce Act and the Administrative Procedure Act is at least as broad as the concept of "life, liberty, or property" in the Due Process Clause. In the circumstances of this case, therefore, we need not separately consider the constitutional claims of the petitioners, but will treat the constitutional claims as subsumed in the statutory claims.
 
 
 24
 The word "interested" is not defined in either statute, nor is there a ready and convenient definition in the case law. As the Supreme Court said in interpreting the word "interest" in the old Interstate Commerce Act:[23]
 
 
 25
 The reference in § 5 to "interested parties," like the reference in § 1(20) to "party in interest," must be interpreted in accordance with the rules relevant to standing to become parties in proceedings under the Interstate Commerce Act. A hearing under that Act is not like a legislative hearing and "interest" is not equivalent to "concern." It may not always be easy to apply in particular cases the usual formulation of the general principle governing such standing e. g., "the complaint must show that plaintiff has, or represents others having, a legal right or interest that will be injuriously affected by the order." Moffat Tunnel League v. United States, 289 U.S. 113, 119, (53 S.Ct. 543, 545, 77 L.Ed. 1069.) In each case, the sufficiency of the "interest" in these situations must be determined with reference to the particular context in which the party seeks to assert its position.
 
 
 26
 Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 173, 77 S.Ct. 763, 775, 776, 1 L.Ed.2d 726 (1957).
 
 
 27
 Both petitioners and the Commission agree that a competitor is "interested" in the grant of competitive operating authority.[24] Petitioners, however, seem to believe that a motor carrier or other person should automatically be granted the right to intervene in a licensing proceeding without proof that he is genuinely a competitor, while the Commission has decided that competitive status must be proved. Petitioners seriously misconceive the nature of the right of intervention and the effect of the new regulations. Only those carriers with a concrete interest however small in the proceeding have a right to intervene. Unless there is some mechanism to screen out would-be intervenors lacking such an interest, the Commission's proceedings will be swamped with participants who have no right under the statute to intervene. Indeed, this describes the administratively chaotic situation these new rules are designed to correct. The Commission has not asserted the power to exclude persons with a cognizable interest; it has merely asserted the power to judge whether any given person has such an interest.[25] The precise definition of "interest" is not, therefore, at issue in this case. At issue is the permissibility of a procedural mechanism for determining whether a given carrier has the requisite interest.
 
 B
 
 28
 Congress has expressly delegated to the ICC authority to prescribe regulations governing intervention. Section 10328(b) of the Interstate Commerce Act, 49 U.S.C.A. § 10328(b) (1979), entitled "Intervention," provides that "(u)nder regulations of the Interstate Commerce Commission, * * * an opportunity to intervene and participate in * * * a proceeding * * * shall be given to interested persons * * *." (Emphasis added.) Similarly, Section 10321(a) provides: "The Commission may prescribe regulations in carrying out this subtitle." Id. § 10321(a). When an agency exercises authority expressly delegated to it by Congress it is at the zenith of its powers. Its regulations are entitled to "more than mere deference or weight." Batterton v. Francis, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977). We can set such regulations aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law(.)" 5 U.S.C. § 706(2)(A) (1976).[26]
 
 
 29
 This is particularly true when the regulations concern operating procedures, which are uniquely within the expertise of the agency.[27] The Administrative Procedure Act and the Interstate Commerce Act prescribe certain procedures that must be followed by the ICC; beyond that, procedural regulations are generally within the discretion of the agency. See generally Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). This court has repeatedly stated that an agency "should be accorded broad discretion in establishing and applying rules for * * * public participation." BPI v. Atomic Energy Comm'n, 502 F.2d 424, 427 (D.C.Cir.1974); Cities of Statesville et al. v. Atomic Energy Comm'n, 441 F.2d 962, 977 (D.C.Cir.1969) (en banc ); City of San Antonio v. CAB, 374 F.2d 326, 332 (D.C.Cir.1967); Office of Communication of United Church of Christ v. FCC, 359 F.2d 994, 1005-1006 (D.C.Cir.1966).[28]
 
 
 30
 In interpreting a similar grant of authority to the Federal Communications Commission (FCC) to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice," 47 U.S.C. § 154(j) (1976), the Supreme Court said that Congress " 'explicitly and by implication' delegat(ed) to the Commission power to resolve 'subordinate questions of procedure . . . (such as) the scope of the inquiry, whether applications should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions.' " FCC v. Schreiber, 381 U.S. 279, 289, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965), quoting FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940) (ellipsis and second brackets in original). Where Congress has delegated such authority to an agency it is not the place of this court to interfere, absent a clear violation of the statutory terms.
 
 C
 
 31
 Even if we were to apply a more exacting standard of review, we would have difficulty discerning any abuse of discretion or statutory violation in the rules under review. Petitioners claim that "(b)y their very nature, these criteria demonstrate that some interested persons will be refused the right to participate in proceedings before the agency without any improper application of the rules." Joint brief for petitioners at 32. But they suggest not one example of a category of interested persons that will be denied permission to intervene under these rules. Admittedly, some may not be granted automatic intervention, but there is no reason to believe that any person genuinely interested in the outcome of a motor carrier licensing proceeding will fail to satisfy the criteria for permissive intervention.
 
 
 32
 All carriers possessing the necessary equipment and operating authority who have performed any service within the scope of the application may participate in the licensing proceeding without even filing a formal petition to intervene. Such carriers are the actual present competitors of the license applicant; their participation is obviously required under the statutes. Other carriers may also have an economic interest in the routes in question. For example, they may have invested money or effort in soliciting business within the proposed service area. These carriers, too, will be permitted to intervene in licensing proceedings, provided they submit a petition to intervene outlining the nature of their interest affected by the proceeding. Whether the interest asserted by a particular petitioner to intervene will suffice to justify his participation will depend, as it should, on the facts of the particular situation.[29] See Alleghany Corp. v. Breswick & Co., supra, 353 U.S. at 173, 77 S.Ct. at 775; City of San Antonio v. CAB, supra, 374 F.2d at 332. The Commission explained:
 
 
 33
 Under the rules adopted here, no carrier or other person will be prevented from petitioning to intervene with leave. Information concerning competitive conditions within an affected marketplace can be developed in a petition under subsection (vi) of Special Rule 247(l )(2). Based upon information contained in a petition, in the application and in any other available material, the need to permit a person to intervene for the purpose of further developing the record with respect to the competitive impact of a proposed service can be evaluated at the threshold level. If it appears, on the basis of information supplied, that competitive conditions within an affected marketplace warrant further examination, intervention may be permitted with respect to that issue.
 
 
 34
 Protest Standards, supra, 43 Fed.Reg. at 50910, DA 48-49.
 
 D
 
 35
 The ICC's new intervention rules are far from "novel"[30]; rather, the new rules bring the agency into line with the common practice in other federal agencies. The Civil Aeronautics Board (CAB), for example, permits intervention to parties with a statutory right to intervene, and to any other parties "whose intervention will be conducive to the ends of justice and will not unduly delay the conduct of (the) proceeding * * *." 14 C.F.R. § 302.15(a) (1979). In passing on a petition to intervene the CAB takes into consideration essentially the same factors as those listed by the ICC in subsection (l ).[31] Similar intervention rules govern proceedings before the Nuclear Regulatory Commission (NRC), 10 C.F.R. § 2.714 (1979), and the Federal Energy Regulatory Commission (FERC), 18 C.F.R. § 1.8 (1979).[32] This court has upheld similar intervention rules promulgated by NRC's predecessor agency, the Atomic Energy Commission (AEC).[33] BPI v. Atomic Energy Comm'n, supra, 502 F.2d 424. Those rules required that persons seeking to intervene in licensing proceedings file written petitions under oath with supporting affidavits setting forth with particularity the facts pertaining to their claim of interest. Id. at 425, quoting 10 C.F.R. § 2.714(a). The rules were promulgated pursuant to the AEC's power to
 
 
 36
 make, promulgate, issue, rescind, and amend such rules and regulations as may be necessary to carry out the purposes of this chapter.
 
 
 37
 Section 161(p) of the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2201(p) (1976). The petitioners in BPI argued that the requirements of the AEC regulations infringed their right under id. § 189(a), 42 U.S.C. § 2239(c) (1976), as a "person whose interest may be affected by the proceeding" to participate in the licensing proceeding.[34] This argument was rejected by the court:
 
 
 38
 Section 189(a) does not in literal terms state that any person whose interest is affected may intervene; it states that such a party shall be granted a hearing upon request and the Commission shall admit any such person as a party to the proceeding. The statute does not confer the automatic right of intervention upon anyone. Under its procedural regulations it is not unreasonable for the Commission to require that the prospective intervenor first specify the basis for his request for a hearing. * * *
 
 
 39
 BPI v. Atomic Energy Comm'n, supra, 502 F.2d at 428. Thus the analogous intervention rules of other agencies operating within similar statutory schemes provide ample precedent for the ICC's decision.
 
 
 40
 On the basis of these considerations and authorities, we cannot say that the new intervention rules on their face violate the Interstate Commerce Act, the Administrative Procedure Act, or the Constitution.
 
 III
 
 41
 Petitioners also make a number of specific arguments which should be discussed separately.
 
 
 42
 * Petitioners claim that the new intervention rules will "foreclose( )" the ICC's "ability to examine the complete competitive environment." Joint brief for petitioners at 18. They note correctly that the ICC may grant operating authority only when a license applicant can show that "the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity." 49 U.S.C.A. § 10922(a)(2) (1979). In evaluating an application for contract carriage authority the Commission must consider "the effect that granting the permit would have on the transportation of carriers protesting the granting of the permit(.)" Id. § 10923(b)(2)(C). As petitioners say, "Such provisions obviously contemplate a careful examination by the Commission of services already available from previously certificated carriers before it may make a rational determination of what new or additional carrier services are required * * *." Joint brief for petitioners at 17.[35] Petitioners contend that the new rules will impede the ICC's ability to make such determinations.
 
 
 43
 This contention is based on speculation that the Commission will improperly exclude competitors from participating in licensing proceedings. There is nothing on the face of the rules to inspire such pessimism. The rules grant automatic intervention to the actual current competitors of the applicant and permissive intervention to other persons asserting a genuine economic interest in the proceeding.[36] We have every reason to expect that all interested persons will be able to participate in the proceedings, and thus that the Commission will receive information concerning the full competitive environment. Indeed, by eliminating frivolous protests by persons lacking a genuine interest in the proceeding, the new rules enhance the ICC's ability to make licensing determinations rationally and expeditiously.
 
 B
 
 44
 Petitioners also argue that the new intervention rules "lack a rational basis and are arbitrary and capricious." Joint brief for petitioners at 37. They object that the Commission failed to undertake a "properly-formulated cost/benefit study," id. at 38, and that the new rules will be "administratively counterproductive." Id. at 40. This argument is groundless. An agency does not have to undertake a formal cost/benefit study whenever it exercises its discretion to change or amend its procedural rules. The Commission determined that the precise cost of implementing the new rules could not be determined, but predicted that there would be no "significant increase" over past costs. Protest Standards, supra, 43 Fed.Reg. at 50911, DA 51. It stated that it would monitor the rules and publicly report its findings; in this way the Commission may acquire information that may be needed to make further changes in the regulations in the future. With respect to the likely administrative consequences of these regulations, it is significant that other agencies employ similar intervention rules without suffering the dire consequences predicted by the petitioners.[37] We do not find the rules "arbitrary and capricious" in this regard; indeed, we believe they are a sensible way for the Commission to control its docket.
 
 
 45
 Petitioners also claim that it was arbitrary and capricious to treat solicitation efforts as a ground for permissive rather than automatic intervention. Joint brief for petitioners at 41-45. However, we find no ground for reversal on this issue under the applicable standard of review. Petitioners have done little more than state their opinion that the rule should have been constructed differently. But the rules concerning solicitation are among the regulations most carefully studied by the ICC. In its Advance Notice of Proposed Rulemaking the Commission asked for public comments on how solicitation efforts by carriers should be regarded under the intervention rules. 42 Fed.Reg. 59987 (November 23, 1977), DA 3. In the Proposed Rules the Commission proposed that carriers having equipment and authority to perform service within the scope of the application should be able to intervene automatically if they had solicited customers for such service in person, by telephone, or by direct mail. It specifically asked for further comments on the solicitation issue. 43 Fed.Reg. at 17010, DA 12. After receiving several comments that the proposed solicitation provision would enable carriers with no genuine interest in the proceeding to intervene on the basis of perfunctory solicitation efforts,[38] the Commission concluded that solicitation should be made a basis only for permissive intervention. The Commission explained:
 
 
 46
 The rules, as proposed, would permit, with certain limitations, automatic intervention for any capable carrier which has solicited business controlled by those supporting the application and which would have involved transportation performed within the scope of the application. Participants have alerted us to the numerous circumstances which could attend consideration of this intervention criterion. The proposed rules would not permit a thoroughgoing assessment of a carrier's solicitation efforts.
 
 
 47
 To avoid needless confusion and to facilitate consideration of all factors which may have a bearing upon a carrier's interest in this regard, we have concluded that solicitation should not be a ground for automatic intervention; rather, it should form a basis for intervention with leave.
 
 
 48
 Protest Standards, supra, 43 Fed.Reg. at 50909, DA 38-39. Such responsiveness to public comments is one of the hallmarks of reasoned decisionmaking and can hardly be called "arbitrary and capricious."
 
 
 49
 Nevertheless, petitioners assert that the Commission "ignored several realities of the transportation marketplace," joint brief for petitioners at 44, because of the differences in solicitation efforts characteristically undertaken by various carriers and types of carriers. Petitioners' criticism is belied, however, by the Commission's careful statement about the variations in methods of solicitation which will be considered by it in deciding whether to grant intervention:
 
 
 50
 As a general rule, we believe that interest can be demonstrated in particular traffic or business only where solicitation is direct (through personal contact, by telephone or in person) and recurring. We recognize that with certain types of carriers, direct solicitation is not practical and the industry practice is to employ general advertising. For example, motor bus carriers, household goods carriers, and other similarly situated which hold themselves out to the general public will engage principally in less direct forms of solicitations, such as newspaper advertisements, brochures, yellow pages, television and radio commercials. In evaluating petitions to intervene based on solicitation, this circumstance will be taken into account.
 
 
 51
 Protest Standards, supra, 43 Fed.Reg. at 50909, DA 40. We find nothing arbitrary or capricious in this treatment of solicitation efforts.
 
 C
 
 52
 Petitioners also argue that the ICC abused its discretion by "ignor(ing) the existence of alternative administrative methods of expediting its licensing proceedings." Joint brief for petitioners at 45. They assert that, lacking "detailed consideration" of suggested alternatives, the Commission's decision failed to articulate a "rational connection between the facts it found and the choice of rules it made." Id. at 46, citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167-168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).
 
 
 53
 The record indicates, however, that the Commission proposed, considered, and ultimately rejected three alternatives to the final rules: (1) imposing a substantial filing fee upon protests, (2) requiring that license applications be limited in scope in order to eliminate apparent encroachments on the interests of carriers otherwise unaffected by a proposed service, and (3) requesting that Congress increase appropriations to the ICC for coping with the backlog of applications. Proposed Rules, supra, 43 Fed.Reg. at 17010, DA 15. Petitioners proposed an additional alternative which was not adopted by the Commission: that the Commission rely on applicants' motions to strike protests submitted by carriers with no interest in the proceeding. Joint brief for petitioners at 47. The Commission's stated reasons for rejecting these specific alternatives were admittedly somewhat sketchy and conclusory; however, its decision regarding its internal procedures lies peculiarly within the agency's discretion. Elsewhere in its statement the Commission amply justified the rules.
 
 
 54
 Moreover, we observe that, far from routinely rejecting alternative proposals, the Commission adopted many suggestions from the public in the final rules. The changes in the treatment of solicitation have already been discussed[39]; they show that the Commission was willing to consider and adopt suggested alternatives to its proposed rules. Another example is the Commission's decision to delete the requirement that petitions to intervene be verified. This was in direct response to public criticism of the proposed rules. Protest Standards, supra, 43 Fed.Reg. at 50909, DA 37-38.[40]
 
 
 55
 We question whether the proposals not adopted by the ICC should be viewed strictly as "alternatives." As the Commission has emphasized, it must "look to every possible means of expediting the decisionmaking process and overcoming regulatory lag." Proposed Rules, supra, 43 Fed.Reg. at 17010, DA 10. The suggested alternatives are not incompatible with the new intervention rules, and the Commission has stated that they might be pursued in the future if conditions warrant it. Brief for respondents at 39.
 
 
 56
 We are satisfied that the Commission examined the alternatives and articulated reasons for adopting its new rules. While a more detailed discussion of the relative merits of suggested approaches would have been desirable, we cannot say that the Commission's treatment of the issue was an abuse of discretion.
 
 D
 
 57
 Intervenor International Brotherhood of Teamsters argues that the new intervention rules impermissibly infringe on the right to intervene provided by Section 10328(a) of the Interstate Commerce Act, 49 U.S.C.A. § 10328(a) (1979):
 
 
 58
 Designated representatives of employees of a carrier may intervene and be heard in a proceeding arising under this subtitle that affects those employees.
 
 
 59
 Under the new intervention rules a labor union seeking to intervene in a motor carrier licensing proceeding must submit a petition to intervene, which will be granted or denied by the Commission on the basis of the seven factors listed in subsection (l ) of the regulations. The Teamsters assert that denial to labor unions of an automatic right of intervention violates the statute.
 
 
 60
 The Teamsters commit the same error the carrier interests committed: they confuse the right to intervention with the right to automatic intervention. The statute expressly grants a labor union the right to intervene only where the proceeding "affects" its members. As we interpret the new intervention rules, the ICC will permit intervention by labor representatives whenever they show that their members would be affected by the proceeding. Only when they cannot show such effect in their petition to intervene will the labor representatives be denied participation. Although this requirement fails to make the union's intervention rights automatic, it makes them no less absolute or enforceable.
 
 
 61
 Among the criteria announced for evaluating petitions to intervene are two that should serve to ensure that labor petitioners' rights are protected. The first criterion subsection (l )(2)(i) is "(t)he nature, if any, of the petitioner's right under a statute to be made a party." The second criterion subsection (l )(2)(iii) is "(t)he effect of the decision which may be rendered upon the petitioner's interest." Protest Standards, supra, 43 Fed.Reg. at 50911, DA 53-54, 49 C.F.R. § 1100.247(l )(2)(i), (iii) (1979). Since any labor union with a right to intervene under the statute will be granted intervention under these criteria, the Teamsters' challenge is groundless.
 
 
 62
 The Teamsters' reliance on Brotherhood of Railroad Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947), is misplaced. Railroad Trainmen held that a labor union that can prove its members would be affected by a proceeding under the Interstate Commerce Act has an absolute and unconditional right to intervene. The case does not suggest that a union has such a right where it does not show the nature of its interest in the proceeding. See id. at 530-531, 67 S.Ct. at 1392-1393. Under the ICC's new intervention rules the Commission will judge whether a labor union has alleged a sufficient interest under the statute; that judgment may be reviewed immediately in the Court of Appeals. The statute demands no more.
 
 IV. CONCLUSION
 
 63
 Underlying the specific arguments marshalled by petitioners in these cases is their "conviction that the Commission's action is tantamount to deregulation by amendment of the Interstate Commerce Act." Joint reply brief for petitioners at 2. They fear that the new intervention rules would "constitute an important accommodation to freer entry" and insist that steps in that direction should not be taken until Congress passes a deregulation bill. Joint brief for petitioners at 19. They may be correct that moves toward simplifying and streamlining motor carrier licensing proceedings will facilitate entry by additional carriers. Such increased entry may well advance the result apparently feared by petitioners: that competition will replace regulation as the principal means of governing the transportation market. But we decline to speculate on such possible consequences of the order under review. Our only task is to judge whether the Commission has remained within the bounds of its statutory authority and has engaged in reasoned decisionmaking.
 
 
 64
 We observe that Congress has delegated to the ICC considerable authority over its procedures, with the apparent expectation that this authority will be exercised to foster the public interest. Congress did not forbid the Commission to alter its procedures in accordance with changes in the political environment or its perception of the public good. This court has no authority to interfere with the decision of Congress to leave questions regarding relative freedom of entry or permissiveness of intervention to the Commission.
 
 
 65
 We find the new intervention rules justified by statute, and not arbitrary, capricious, or an abuse of discretion. The decision under review is
 
 
 66
 Affirmed.
 
 
 
 *
 Consolidated with the following cases (identified by this circuit's case number and petitioner), in all of which the United States of America and the Interstate Commerce Commission are the respondents: No. 79-1105, Motor Carriers Central Freight Association et al.; No. 79-1164, Refrigerated Transport Co., Inc. et al.; and No. 79-1173, Sawyer Transport, Inc
 
 
 [1]
 Petitioner in No. 78-2260 is American Trucking Associations, Inc. After that appeal was filed the Commission made slight modifications and clarifications in the challenged regulations at the behest of certain motor carrier participants in the rulemaking. See note 2 infra. After these modifications the other petitions for review were filed with this court. Petitioners in Nos. 79-1105, 79-1164, and 79-1173 are motor carriers or groups of motor carriers regulated by the ICC. No. 79-1164 was originally filed in the Fifth Circuit and was transferred here by order of that court
 
 
 [2]
 The regulations under review, 49 C.F.R. § 1100.247(e)(9), (k)-(m) (1979), were issued in Ex Parte No. 55 (Sub-No. 26), Protest Standards in Motor Carrier Application Proceedings (1978), printed at 43 Fed.Reg. 50908 (Nov. 1, 1978), Deferred Appendix (DA) 28. The regulations were modified and clarified by the Commission on December 21, 1978, 43 Fed.Reg. 60277 (Dec. 27, 1978), DA 70. The modifications do not materially affect this appeal
 
 
 [3]
 Jurisdiction of this court derives from 28 U.S.C. §§ 2321(a), 2342(5) (1976)
 
 
 [4]
 By order of March 6, 1979 this court denied petitioners' motion for a stay of the effective date of the regulations, which therefore went into effect on March 1, 1979
 
 
 [5]
 See 49 C.F.R. § 1100.247 (1978)
 
 
 [6]
 Advance Notice of Proposed Rulemaking, 42 Fed.Reg. 59986 (Nov. 23, 1977), DA 2
 
 
 [7]
 The number of applications for permanent motor carrier operating authority has increased from 6,019 in fiscal year 1976, to 8,240 in fiscal year 1977, to 12,832 in fiscal year 1978. In the first nine months of fiscal year 1979 the ICC received 14,396 such applications. As of June 30, 1979, 14,266 such applications were pending before the Commission but not yet decided on. Brief for respondents at 7 n.1
 
 
 [8]
 Advance Notice of Proposed Rulemaking, supra note 6, 42 Fed.Reg. at 59986, DA 2
 
 
 [9]
 Id. at 59987, DA 3
 
 
 [10]
 Id
 
 
 [11]
 Id. at 59986-59987, DA 2-3
 
 
 [12]
 Proposed Rules, 43 Fed.Reg. 17008 (April 21, 1978), DA 4
 
 
 [13]
 See. id. The final rules are in most respects identical to the proposed rules
 
 
 [14]
 Protests Standards, supra note 2, 43 Fed.Reg. at 50908, DA 29-30; joint brief for petitioners at 8. Some smaller carriers and prospective entrants into the carrier field, however, supported the new rules. Proposed Rules, supra note 12, 43 Fed.Reg. at 17008, DA 5
 
 
 [15]
 Protest Standards, supra note 2, 43 Fed.Reg. at 50908, DA 30
 
 
 [16]
 Id. at 50911, DA 55-56, 49 C.F.R. § 1100.247(m) (1979)
 
 
 [17]
 28 U.S.C. §§ 2321(a), 2342(5) (1976); see City of Houston v. CAB, 317 F.2d 158 (D.C.Cir.1963) (per curiam )
 
 
 [18]
 See note 4 supra
 
 
 [19]
 Petitioners' discussion of recent orders and rulemakings other than the Protest Standards, supra note 2, see joint brief for petitioners at 32-34, is irrelevant to this appeal, and it would be improper for this court to comment on those orders here
 
 
 [20]
 Interstate Commerce Act § 10306(b), 49 U.S.C.A. § 10306(b) (1979), provides in full:
 A party may appear and be heard before the Commission, a division, an individual Commissioner, a board, or an employee delegated to act under section 10305 of this title in person or by an individual admitted to practice under section 10308 of this title. A hearing before the Commission, a division, an individual Commissioner, a board, or an employee shall be made public on the request of any interested party.
 Interstate Commerce Act § 10328(b), 49 U.S.C.A. § 10328(b) (1979), provides in full:
 Under regulations of the Interstate Commerce Commission, reasonable notice of, and an opportunity to intervene and participate in, a proceeding under this subtitle related to transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title that is, or is proposed to be, provided in a State shall be given to interested persons and to the authority of that State having jurisdiction to regulate transportation by motor vehicles in intrastate commerce on the highways of that State, or, if there is no such authority, to the chief executive officer of the State.
 On October 17, 1978 Congress passed Pub.L.No. 95-473, 92 Stat. 1337, codifying the Interstate Commerce Act and enacting it into positive law. In the new Interstate Commerce Act Congress substituted "simple language" for "awkward and obsolete terms" and eliminated obsolete provisions, but intended no "substantive change." H. R. Rep. No. 1395, 95th Cong., 2d Sess. 4 (1978); see also id. at 8, 9-10. Section 10306(b) of the new Act derives from § 17(3) of the old Act, with the phrase "an interested party" substituted for the phrase "any party interested." We assume no change in meaning was intended, as the House Report makes no mention of the substitution. Id. at 28-29. Section 10328(b) of the new Act derives from § 305(e) of the old Act, with the phrase "interested persons" substituted for the phrase "interested parties." The House Report states: "The word 'persons' is substituted for 'parties' as being more accurate." Id. at 40. The concept of "interest" remained the same.
 
 
 [21]
 Administrative Procedure Act, 5 U.S.C. § 554(c) (1976). This subsection provides in full:
 (c) The agency shall give all interested parties opportunity for
 (1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and
 (2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.
 Persons lacking a sufficient specific interest do not, of course, have the right to intervene. Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 173-175, 77 S.Ct. 763, 775-776, 1 L.Ed.2d 726 (1957); Martin-Trigona v. Federal Reserve Board, 509 F.2d 363, 365-367 (D.C.Cir.1975).
 
 
 [22]
 See Londoner v. Denver, 210 U.S. 373, 385-386, 28 S.Ct. 708, 713-714, 52 L.Ed. 1103 (1908); cf. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972) (right to be heard on application sought by competitive motor carriers protected by First Amendment right of petition)
 
 
 [23]
 The specific provisions interpreted by the Court §§ 1(20) and 5(b) of the old Act are not the same as §§ 10306(b) and 10328(b) of the new Act which we are interpreting here. The key word "interest," however, is the same, and is used in the same sense. Alleghany Corp. therefore still serves as a description of the "interest" inquiry under the new Act. In one sense not significant here the holding of Alleghany Corp. has been changed by subsequent precedent. The "usual formulation" of interest as "a legal right or interest" has been replaced by the concepts of "injury in fact" and "zone of interests." Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972). Under either formulation a competitor has standing to intervene
 
 
 [24]
 Thus petitioners' reliance on Virginia Petroleum Jobbers Ass'n v. FPC, 265 F.2d 364 (D.C.Cir.1959), is misplaced. Virginia Jobbers held that persons showing economic injury from an agency decision have standing to intervene in the proceeding without also showing that they can represent the public interest. Id. at 367 n.1. In the case at bar the ICC does not seek to exclude anyone able to show such an economic injury, but only to require proof of such injury or interest as a prerequisite to intervention
 
 
 [25]
 See Martin-Trigona v. Federal Reserve Board, supra note 21, 509 F.2d at 367 (holding that a would-be participant in an agency proceeding and court review must "particularly allege( ) an injury in fact" in order to establish standing). See also Koniag, Inc., Village of Uyak v. Andrus, 580 F.2d 601, 607 (D.C.Cir.1978) (holding that an agency decision that a party is "aggrieved" for purposes of standing to intervene is "entitled to great deference")
 
 
 [26]
 See 2 K. Davis, Administrative Law Treatise §§ 7:8-7:12 at 36-58 (2d ed. 1979)
 
 
 [27]
 See, e. g., FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143-144, 60 S.Ct. 437, 411, 84 L.Ed. 656 (1940):
 Thus, this Court has recognized that bodies like the Interstate Commerce Commission * * * should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties. * * * To be sure, the laws under which these agencies operate prescribe the fundamentals of fair play. They require that interested parties be afforded an opportunity for hearing and that judgment must express a reasoned conclusion. But to assimilate the relation of these administrative bodies and the courts to the relationship between lower and upper courts is to disregard the origin and purposes of the movement for administrative regulation and at the same time to disregard the traditional scope, however far-reaching, of the judicial process. * * *
 (Footnote omitted.)
 
 
 [28]
 In Youngstown Cartage Co. v. ICC, 571 F.2d 1243, 1245 (D.C.Cir.1978) (per curiam ), this court said: "It is apparent that this case involves issues of regulatory policy and internal administration of Commission operations. We are not free to select the rules we think best. The Commission must be given considerable leeway in control of its calendar." In Nader v. FCC, 520 F.2d 182, 195 (D.C.Cir.1975), we stressed that "this court has upheld in the strongest terms the discretion of regulatory agencies to control the disposition of their caseload."
 
 
 [29]
 Petitioners attempt to characterize the new intervention rules as requiring a carrier to demonstrate "substantial" interest in the licensing proceeding. Joint brief for petitioners at 29. This is misleading. As petitioners themselves admit, id., the word used by the Commission to describe the interest that must be asserted in order to justify intervention is "sufficient." Protest Standards, supra note 2, 43 Fed.Reg. at 50908, DA 28. A "sufficient" interest for purposes of intervention or standing is "injury in fact." The Supreme Court itself has used the term "sufficient" in this context. Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); Sierra Club v. Morton, 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972)
 
 
 [30]
 Joint brief for petitioners at 30
 
 
 [31]
 14 C.F.R. § 302.15(b) (1979) provides:
 In passing upon a petition to intervene, the following factors, among other things, will be considered: (1) The nature of the petitioner's right under the statute to be made a party to the proceeding; (2) the nature and extent of the property, financial or other interest of the petitioner; (3) the effect of the order which may be entered in the proceeding on petitioner's interest; (4) the availability of other means whereby the petitioner's interest may be protected; (5) (t)he extent to which petitioner's interest will be represented by existing parties; (6) the extent to which petitioner's participation may reasonably be expected to assist in the development of a sound record; and (7) the extent to which participation will broaden the issue or delay the proceeding. * * *
 The ICC modeled its new intervention rules after the CAB rules. Proposed Rules, supra note 12, 43 Fed.Reg. at 17010, DA 14.
 
 
 [32]
 The Federal Communications Commission (FCC) has similar intervention rules, 47 C.F.R. § 1.223 (1979), but also permits persons lacking any sufficient interest to give testimony at hearings, id. § 1.225
 
 
 [33]
 The rules of the present-day NRC regarding intervention in licensing proceedings, 10 C.F.R. § 2.714 (1979), are identical to the AEC's old rules, except that the requirements of oaths and supporting affidavits have been omitted
 
 
 [34]
 The petitioners in BPI primarily objected to the requirement of the AEC regulations that a person seeking to intervene specify the "subject matter of the proceeding as to which he wishes to intervene" and "the basis for his contentions with regard to each aspect on which he desires to intervene." 10 C.F.R. § 2.714(a), quoted in BPI v. Atomic Energy Comm'n, 502 F.2d 424, 425 (D.C.Cir.1974)
 
 
 [35]
 See Argo-Collier Truck Lines Corp. v. United States, 611 F.2d 149, 152 (6th Cir. 1979); see also P. C. White Truck Line, Inc. v. ICC, 551 F.2d 1326, 1328 (D.C.Cir.1977) (per curiam )
 
 
 [36]
 Common carriers may intervene in contract carriage application proceedings if they, as petitioners to intervene, show that they are providing transportation services of a type that might lead to denial of the contract carriage license. Protest Standards, supra note 2, 43 Fed.Reg. at 50910, DA 46. Thus petitioners' statement that "(t)he protest standards expressly limit the right of competing common and contract carriers to oppose each others' applications," joint brief for petitioners at 16 n.11, is untrue. Only their right to automatic intervention is limited
 
 
 [37]
 See text at notes 30-34 supra
 
 
 [38]
 See brief for respondents at 34-35
 
 
 [39]
 See text at note 38 supra
 
 
 [40]
 See also Protest Standards, supra note 2, 43 Fed.Reg. at 50909, DA 40-42 (Documentation); id. at 50910, DA 44-45 (Fields of Service)