**AMERICAN TRANSFER & STORAGE CO., et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents.**

**No. 81–4072.**

United States Court of Appeals, Fifth Circuit.

Nov. 21, 1983.

Phillip Robinson, Joseph H. Hart, Austin, Tex., for American Transfer et al.

Ewell H. Muse, Jr., Austin, Tex., for Herder.

John H. Broadley, Gen. Counsel, Daniel B. Harrell, Atty., Kenneth P. Kolson, I.C.C., John J. Powers, III, Dept. of Justice, Washington, D.C., for I.C.C.

Paul D. Angenend, Austin, Tex., Charles Ephraim, Washington, D.C., for H.S. Anderson Trucking Co. et al.

Mark J. Andrews, William H. Shawn, Washington, D.C., for Motor Carrier Lawyers Ass'n.

James M. Doherty, Austin, Tex., for J.H. Rose Truck Line, Inc. et al. and C & H Transp. Co., Inc.

Thomas E. James, Dallas, Tex., for C & H Transp. Co., Inc.

Hugh T. Matthews, Dallas, Tex., for Steere Tank Lines, Inc.

Before BROWN and RANDALL, Circuit Judges, and DUPLANTIER *, District Judge.

JOHN R. BROWN, Circuit Judge:

Before us are numerous motor carrier petitioners and certain intervenors who protest the validity of the rules for motor carrier applications[1] promulgated by the

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. The interim rules were found at 49 C.F.R. § 1100.247(A)—How to Apply for Operating Authority, 49 C.F.R. § 1100.247(B)—How to Oppose Requests for Authority, and 49 C.F.R. § 1100.247(C)—General Rules Governing the Application Process.

Interstate Commerce Commission (the Commission) in response to the Congressional enactment of The *Motor Carrier Act of 1980* (MCA).[2] The petitioners contend that the rules are invalid since they were promulgated in violation of the Administrative Procedure Act (APA)[3] because:

(i) the Commission did not comply with the notice (§ 553(b) and (d)) and comment (§ 553(c)) requirements;

(ii) although denominated as procedural, the rules are not entitled to that exemption (§ 553(b)(A)) since the rules have an adverse substantive impact on carriers and carrier applicants; and

(iii) the Commission did not have or adequately find good cause for its finding that notice and public comment were impracticable, unnecessary, or contrary to the public interest (§ 553(b)(B)).

Petitioners also seem to contend that even if promulgated properly the rules substantively are invalid under the MCA. Staunchly defending its authority to make the necessary changes in its procedures to effectuate the expressed will of Congress in enacting the MCA, the Commission urges that it was empowered to issue the rules

and that their promulgation meets the bounds of both the APA and the MCA. In support of its position, the Commission urges that these rules are a procedural mechanism for control of its own calendar requiring no notice and comment. In any event, the Commission maintains it had found good cause for not following the notice and comment called for by the APA. Insofar as a substantive challenge is really made, the rules, the Commission contends, were reasonable and statutorily well founded. Because we find that the Commission had good cause (see (iii) above) and the rules adequately pass substantive muster, we uphold the determination by the Commission that its rules are valid and their issuance comports with the provisions of both the APA and the MCA. This makes it unnecessary for us to determine whether these are procedural rules entitled to the § 553(b)(A) exception (see (ii) above) or the in-between variety of rules that have substantial impact on the applicants as recognized by our much criticized declaration in *Brown Express, Inc. v. United States*, 607 F.2d 695, 702 (5th Cir.1979).[4]

The final rules are codified at 49 C.F.R. § 1160.1–1160.23—How to Apply for Operating Authority, 49 C.F.R. § 1160.40–1160.49—How to Oppose Requests for Authority, and 49 C.F.R. § 1160.61–1160.68—General Rules Governing the Application Process.

**2.** 49 U.S.C. § 10101 *et seq.* (West Supp.1983).

**3.** 5 U.S.C. § 500 *et seq.*

**4.** In *Brown Express* we stated that the relevant inquiry was not whether the rule could be classified as either substantive or procedural, but "rather whether the rule will have a 'substantial impact' on those regulated." 607 F.2d at 702.

Professor Davis, calling the authoritative effect of our holding "slight," strongly disagrees. He emphatically classifies the rule at least in *Brown Express* as *procedural*. Quoting our language in *Brown Express* which rejects the procedural nature of the rule at issue there, Professor Davis states

The opinion is unclear, but the court seemed to say that the APA requires notice and comment procedure for the procedural rule that has substantial impact; *that is clearly not the law.* The furthest a court may soundly go is to hold that when the APA does not apply, common law requires notice and comment

procedure for rules having substantial impact.

K. Davis, Administrative Law Treatise § 6:31 (Supp.1982) (hereinafter "Supplement") (emphasis added); *see also Citizens to Save Spencer City v. Environmental Protection Agency*, 600 F.2d 844, 876 n. 153 (D.C.Cir.1979) ("[A] finding of 'substantial impact' of an agency's rule has not been deemed determinative of whether that rule is interpretive or legislative, and therefore whether it is subject to notice and comment requirements of the APA.") *British Caledonian Airways Ltd. v. Civil Aeronautics Board*, 584 F.2d 982, 989 (D.C.Cir.1978) ("Merely because a *rule* has a wide-ranging effect does not mean that it is 'legislative' rather than 'interpretative'"). *See also, Energy Reserves Group, Inc. v. Department of Energy*, 589 F.2d 1082, 1094–95 (Em.App.1978). The court there declares that the substantial impact test to determine whether a rule is legislative or interpretative (procedural) is "unsound in law and experience." In emphatic terms the court states that

[t]he substantial impact test is illogical because every significant interpretative rule choosing between two or more interpretations of a legislative rule or a statute has an effect ('substantial impact') on the hopes, de-

### The Genesis of the Rules

#### The Genesis of MCA

Looking for the Genesis of the Rules under attack is simple: they came from the MCA. The more basic inquiry is what is the Genesis of the MCA?

The MCA became effective July 1, 1980.[5] It was the most comprehensive piece of legislation[6] affecting the surface non-rail transportation industry since 1935. But what brought on the MCA is a mixture of a number of factors. Primarily it was the dissatisfaction of Congress—then well into its new era of deregulation—with the delays which it regarded as interminable and unreasonable in the Commission's processes in motor carrier matters, such as: the granting or broadening of operating rights, or the elimination or addition of traditional but costly restrictions as to commodities, gateways, routes or dead backhauls. These delays were, so Congress legitimately thought, the result if not the cause of traditional practices likening many motor carrier applications to the now "Big" District Court case with applications, protests, witnesses, hearings, briefing, formal arguments, proposed reports, exceptions, briefs, rearguments, issuance of final reports, petitions for reconsideration, motions for stay and, at the end, a petition for review to either the former three-judge District Court and later to a Court of Appeals.[7]

Added to this were the Commission's substantive, significant changes lessening restrictions and liberalizing standards, especially for entry into the business of a certificated motor carrier.[8]

sires, expectations or beliefs of some of those regulated by the rule or statute. So, under the 'substantial impact' test every significant interpretative rule automatically becomes a legislative rule by virtue of its effect. There is nothing in the APA to warrant employment of the 'substantial impact' test to classify interpretative and legislative rules. The phrase 'substantial impact' does not appear in the APA.
*Id.*

5. The legislative background and an authoritative interpretation of the MCA have been fully supplied by this Court's decision in *American Trucking Association v. Interstate Commerce Commission,* 659 F.2d 452, 457–61 (5th Cir. 1981), *clarified and enforced through mandamus,* 669 F.2d 957 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983).

6. The announced national transportation policy is contained in the Act itself
§ 10101. Transportation policy
(a) Except where policy has an impact on rail carriers, in which case the principles of section 10101a of this title shall govern, to ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and—
\* \* \* \* \* \*
(2) in regulating transportation by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, passengers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers and intrastate bus services; (F) provide and maintain commuter bus operations; (G) improve and maintain a sound, safe, and competitive privately owned motor carrier system; (H) promote greater participation by minorities in the motor carrier system; and (I) promote intermodal transportation
49 U.S.C. § 10101(a)(2) (West Supp.1983).

7. Appendix C to Ex Parte 55 (Sub-No. 43), 45 Fed.Reg. 86795–97 (December 31, 1980), graphically shows median time for completion of the application process as 327.5 days for the existing modified procedure (no oral hearing) and 378 days where oral hearing was held.

8. Since enactment of the Motor Carrier Act of 1935, the controlling statutory standard for all motor common carrier applications has been that the proposed service "be required by the present or future public convenience and necessity." *See* former 49 U.S.C. § 10922(a)(2). With the statutory standard clearly enunciated, the Commission was entrusted with shaping the scope of what was "publicly convenient and necessary," and applying the definition to applications for operating authority.

During the infancy of motor carrier regulation, the Commission set forth its standard for determining "public convenience and necessi-

Prior to the changes just detailed, the Commission took other serious steps to further streamline its procedures. For example, the Commission required persons seeking operating authority to submit with their applications sufficient information to support grants of such authority if those applications were not opposed. *Ex Parte* No. 55 (Sub-No. 25), 42 Fed.Reg. 62486 (December 1, 1977). The Commission also adopted rules restricting the right of intervention in motor carrier licensing cases. *Ex Parte* No. 55 (Sub-No. 26), 43 Fed.Reg. 50908 (November 1, 1978) *aff'd sub nom American Trucking Associations, Inc. v. United States*, 627 F.2d 1313 (D.C.Cir.1980).

As a result of these changes liberalizing entry into certificated motor carrier status, the number of motor carrier cases increased drastically.[9] As though this flood of new cases was not enough, the Commission suffered not an inadequate increase in staff, but actually a decrease.[10]

Despite the Commission's serious efforts even with the insufficient employees to stem the tide, the result had to be the plague of ever-growing backlogs. Worse, the Commission's backlog failed to disappear. Congress recognized this fact. *See* H.R.Rep. No. 1069, 96th Cong., 2d Sess. 37, *reprinted in* 1980 U.S.Code Cong. & Ad.

ty" in *Pan-American Bus Lines Operation*, 1 M.C.C. 190, 203 (1936):

> The question, in substance, is [i] whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; [ii] whether this purpose can and will be served as well by existing lines or carriers; and [iii] whether it can be served by applicant with the new operation of service proposed without endangering or impairing the operations of existing carriers contrary to the public interest. (Brackets inserted for ease of reference)

Allegiance to the *Pan-American* criteria was long lived. It was not until 1978 that the Commission re-evaluated its historic approach and refined the *Pan-American* criteria. *See Liberty Trucking Co., Extension—General Commodities*, 130 M.C.C. 243 (1978), *aff'd*, 131 M.C.C. 573 (1979), *aff'd sub nom. Assure Competitive Transportation, Inc. v. United States*, 629 F.2d 467 (7th Cir.1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981). Under the Commission's decision in *Liberty*, once the applicant demonstrated a need for the new service, the burden was on the protestants to prove material harm sufficient to outweigh the public need. Furthermore, in *Ex Parte* No. MC–121, *Policy Statement on Motor Carrier Regulation*, 44 Fed.Reg. 60296 (1979) *aff'd sub nom Assure Competitive Transportation, Inc. v. United States*, 635 F.2d 1301 (7th Cir.1980), the Commission determined that the adequacy of existing service (the second *Pan-American* criterion (*see* [ii] above)) should not be a decisional factor in future motor common carrier application cases.

The policy statement reviewed in *Assure Competitive Transportation, supra*, stated:

> [T]oday's conditions require a change in [the *Pan-American*] test. The criteria are overly protective for a mature and financially healthy industry, and they tend to restrain healthy competition. The third part of the *Pan-American* test, [ (*see* [iii] above) ] which provides existing carriers with protection

from competition which would endanger their abilities to continue to perform service needed by the public, offers what we are convinced is a sufficient degree of protection to carriers already in a particular market.

Thus, the Court stated "elimination of the second Pan-American criterion resulted from the Commission's determination that the public convenience and necessity no longer requires observing a protectionist policy appropriate for a different time." *Assure Competitive Transportation*, 635 F.2d at 1305.

9. The number of formal cases filed with the Commission more than doubled from fiscal year 1975 to fiscal year 1980.

| Fiscal Year | No. of Cases Filed |
|---|---|
| 1975 | 9,092 |
| 1976 | 8,297 |
| 1977 | 10,131 |
| 1978 | 15,280 |
| 1979 | 21,661 |
| 1980 | 21,302 |

Taken from 91 ICC Ann.Rep. 111 (1978); 92 ICC Ann.Rep. 101 (1979); 93 ICC Ann.Rep. 113 (1980); 94 ICC Ann.Rep. 111 (1981).

The mushroom in numbers from 1975 to 1980 was due in substantial part to the dramatic increase in the number of motor carrier operating rights cases, which comprised 19,854 and 19,765 of the total proceedings opened in fiscal years 1979 and 1980, respectively. *See* 93 ICC Ann.Rep. 102 (1980); 94 ICC Ann.Rep. 100 (1981).

10. In promulgating its Final Rules Governing Applications For Operating Authority, the Commission pointed out that in fiscal year 1976 it had 2,125 employees and handled 8,857 proceedings. As of December 19, 1980 (just five months after the enactment of the MCA), it had over 25,000 proceedings with a staff of only 1,843 employees. *Ex Parte* No. 55 (Sub No. 43), 45 Fed.Reg. 86771, 86772 n. 2 (December 31, 1980).

News 2283, 2319: "To deal with [its case backlog] the Commission has made serious attempts to streamline its procedures within the confines of the present statute. However, the Commission's backlog of cases has continued to grow."

It was then obvious that if legislation—then in the offing—were passed making it even easier for applicants to obtain operating authority while simultaneously mandating procedural reform, the Commission would have to amend substantially its application rules to accommodate both the large number of new filings that could be expected and the new statutory time limits. Further, if such legislation were to become effective on or shortly after its enactment date, the Commission would have to revise its application procedures immediately or risk frustrating the intent of Congress that those reforms be implemented without delay.

Contemplating this eventuality, and constitutionally and organically unable to take official affirmative action prior to the passage of the legislation, the Commission did the next best thing. On June 6, 1980 it served an "Advance Warning to Prospective Applicants of Interim Application Procedures," informing the public that if the proposed legislation were passed, interim rules and applications would be necessary and the public would have little advance notice of the change in procedures. The Commission also advised that it expected to have the necessary procedures in place and the forms available on the date the legislation became effective or shortly thereafter.[11] 45 Fed.Reg. 39317 (June 10, 1980).

The Commission's prescience was soon made good, for on July 1, 1980, the MCA was signed into law by the President. Immediately thereafter, on July 3, 1980, the Commission promulgated Interim Rules Governing Applications for Operating Authority. These interim rules were effective upon date of their publication in the *Federal Register*. *See Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 45534 (July 3, 1980).

### Impact of MCA

The MCA revised and reduced the burden of proof on the applicant for operating authority. It eliminated altogether the traditional outset burden on the applicant to establish that issuance of the certificate was required by the public convenience and necessity.[12] (*See* 49 U.S.C. § 10922(b)(1) (B).

11. The notice given was:
   AGENCY: Interstate Commerce Commission
   ACTION: Notice to prospective applicants of interim application procedures.
   SUMMARY: In anticipation of the passage of legislation amending the Interstate Commerce Act's motor carrier entry provisions and setting time limits on the processing of non-rail proceedings, the Commission has prepared interim procedures which would affect all operating rights applications [those presently governed by 49 C.F.R. 1100.247] filed after any legislative enactment. Because the legislation is expected to go into effect shortly after passage of the legislation, the Commission projects that interim rules and application forms will be necessary, and the public will have little advance notice of the change in procedures. We expect to have the necessary procedures in place and forms available on the date the legislation becomes effective, or within a few days thereafter.
   In order to ease the transition period between the present application rules and the interim rules, we request the public to halt temporarily the filing of applications under 49 C.F.R.

1100.247 if motor carrier reform legislation passes Congress. Applications using existing forms which are filed with the Commission after the effective date of any new legislation, but before interim rules are published, may be rejected or will be held pending the filing of whatever additional evidence or information is required under the new rules. The rules will be docketed as Ex Parte No. 55 (Sub-No. 43), Rules Governing Applications for Operating Authority.
   45 Fed.Reg. 39317 (June 10, 1980).

12. MCA, 49 U.S.C. § 10922,
   (a) Except as provided in this section and section 10930(a) of this title, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II or III of chapter 105 of this title as a motor common carrier of passengers or water common carrier, respectively, if the Commission finds that—
      (1) the person is fit, willing, and able—
      (A) to provide the transportation to be authorized by the certificate; and

By reducing the burden of proof on persons supporting an application, section 5 of the MCA makes it easier for (i) trucking companies to enter the market and (ii) existing companies to expand their operations.[13] The new 49 U.S.C. § 10922(b) "creates a presumption that the grant of the application is consistent with the public convenience and necessity if the applicant demonstrates that the proposed service will serve a useful public purpose." H.R.Rep. 1069, *supra* note 13, at 15 and 2297. Section 5 also limits which motor carriers can protest applications for operating authority, precluding all protestants but those with demonstrated and defined interests in such proceedings. *See* 49 U.S.C. § 10922(b)(7), (8).

Section 25 of the MCA makes it quite clear that the Congress deemed it "absolutely vital that the Commission be able to process these applications in a fair and expeditious manner." *See* H.R.Rep. No. 1069, *supra* note 13, at 37–39 and 2319–20.[14] Consequently, among the many changes enacted to accomplish this Congressional goal was the establishment of statutory deadlines for Commission action on motor carrier entry cases. *See* 49 U.S.C. § 10322. Section 10322 was amended to require that (i) in any case in which an oral hearing is held the Commission shall conclude evidentiary hearings within 180 days and issue an initial decision within 270 days, and even more important, (ii) in the great bulk of cases which will be handled under modified procedure (those *without* oral hearings), the Commission shall issue a written initial decision within 180 days. These time limitations are statutorily imposed and in extraordinary circumstances may be extended not more than 90 days.[15]

---

(B) to comply with this subtitle and regulations of the Commission; and

(2) the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity.

(b)(1) Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title as a motor common carrier of property if the Commission finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and

(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.

(2) In making a finding under paragraph (1) of this subsection, the Commission shall consider and, to the extent applicable, make findings on at least the following:

(A) the transportation policy of section 10101(a) of this title; and

(B) the effect of issuance of the certificate on existing carriers, except that the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity.

13. Section 5 is designed to make it easier for new trucking companies to enter the market and existing trucking companies to expand their operations. This provision is extremely important because it provides a major balancing factor to the pricing freedom allowed by the bill. The increased competition and potential competition resulting from this section will be a principal check on undue rate increases within the zone of rate freedom established by section 11 of the Act. H.R.Rep. No. 1069, 96th Cong. 2d Sess. 12, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2294 (H.R.Rep. No. 1069).

14. As a preface the report stated:

With the changes proposed by this bill in the statute's entry area, the Committee expects a large number of new applications to be filed with the Commission. These new applications, as well as those now pending before the Commission, are an essential part of the Committee's goal of a more competitive motor carrier industry. *Id.,* U.S.Code Cong. & Admin.News 1980, p. 2319.

15. The House Report contains a helpful summary of 49 U.S.C. § 10322:

Subsection (a) of revised section 10322 provides that section 10322 applies to all nonrail proceedings. However, the section's deadlines do not apply to proceedings involving exempt intrastate transportation, rate

*Issuance of New Rules*

Acting pursuant to the MCA and the Congressional demand for major reforms, the Commission, in keeping with its June 6, 1980 advisory alert, promulgated Interim Rules, effective on date of publication in the *Federal Register.* *See Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 45534 (July 3, 1980).[16] In its published notice of interim

matters, restriction removal, temporary and emergency temporary authority, mergers, or formal investigative matters.

Subsection (b)(1) provides that a division, individual Commissioner, employee board, joint board, or ALJ may make the initial decision. If evidence is taken at an oral hearing or if an issue of general transportation importance is involved, evidentiary proceedings shall be completed by the 180th day following institution of the proceeding, and the initial decision is to be completed by the 270th day. If evidence is taken in written form, the initial decision shall be completed by the 180th day.

Under subsection (b)(2), a final decision shall be issued not later than 180 days in a case involving an application for authority to provide motor carrier transportation incidental to trailer-on-flatcar or container-on-flatcar service by rail.

Subsection (b)(3) requires the Commission at the earliest practicable time to publish notice in the Federal Register of applications filed for operating authority.

Subsection (c) authorizes the Commission or a division to waive the requirement for an initial decision and make the decision at that level. The time limits of subsection (b) apply.

Subsection (d) provides that parties shall have an opportunity to present arguments, as well as submit evidence. The initial decisionmaker may require that they be presented orally or in writing, and may require that they be made at the same time evidence is submitted. Upon issuance of the initial decision, copies shall be served on the parties and submitted to the Commission.

Subsection (e) provides that an initial decision becomes a final decision on the 20th day after it is served, unless (1) an interested party files an appeal during the 20-day period (or during an additional 20-day period, if extended), or (2) the Commission stays or postpones the initial decision during the 20-day period.

Subsection (f)(1) states that the Commission, a division, or an employee board may review an initial decision on its own initiative, and shall review the initial decision if a timely appeal is filed.

Under subsection (f)(2), a final decision reviewing the initial decision shall be made not later than 50 days after initiation of such review. However, pursuant to paragraph (f)(3), if an initial decision is reviewed by a further hearing, the review shall be completed and a final decision made not later than the 120th day after such further hearing is granted.

Subsection (g)(1) authorizes the Commission, at any time on its own initiative because of material error, new evidence, or substantially changed circumstances, to reopen or reconsider one of its actions. Under Commission regulations, interested parties may petition for such reopening or reconsideration. Further, under paragraph (g)(2), the Commission can grant rehearing, reargument, or reconsideration of an action taken by a division or employee board, if it finds that (A) the action involved a matter of general transportation importance, or (B) the action would be affected materially because of clear and convincing new evidence or changed circumstances. Under Commission regulations, interested parties may petition for such rehearing, reargument, or reconsideration. In the event of such reopening, rehearing, etc., final action shall be taken no later than the 120th day after the date such action is initiated.

Subsection (h) provides that a final decision is effective on the date it is served, and that a civil action to enforce, enjoin, suspend, or set aside the decision may be filed after that date.

Subsection (i) permits the Commission, in extraordinary circumstances to extend any of the time periods in the section, except that the total of all such extensions shall not exceed 90 days.

Subsection (b) of this section of the bill repeals section 10323 of title 49. That section's provisions on rehearing, reargument, and reconsideration have been revised and moved to new section 10322.

Subsection (c) strikes language in section 10324(a) which delayed the effectiveness of Commission decisions by 30 days. Under new section 10322, they are effective when served on the parties.

Subsection (d) repeals section 10325 which governs judicial review. Under new section 10322, a Commission action is subject to such review after its effective date, which is the date it is served.

H.R.Rep. No. 1069, *supra* note 13 at 38–40 and 2320–22.

16.     EX PARTE NO. 55 (Sub-No. 43)

RULES GOVERNING APPLICATIONS FOR OPERATING AUTHORITY

AGENCY: Interstate Commerce Commission

ACTION: Notice of interim rules and request for comments.

SUMMARY: The "Motor Carrier Act of 1980" ["the Act"] has made numerous changes in

rules (*see* note 16 *supra*) the Commission made this critical statement:

> These rules of practice and procedure will be used by the Commission on an interim basis. They will apply to applications filed after the date of the Act's effectiveness. The Commission is faced with a situation in which the due and timely required execution of the agency functions would be prevented by undertaking a rulemaking proceeding prior to the adoption of any rules. Thus, notice and comment for these interim rules are not required under 5 U.S.C. 553(b)(A) and (B). Public comments are invited on these interim rules as a basis for final rules, however. We shall act as fast as possible in formulating final rules.[17]

*Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 45534 (July 3, 1980).

### The Rules

Essentially, the interim rules govern two "procedural" areas: (a) form and content of motor carrier licensing applications and responses, and (b) the scheduled handling of such cases. Concerning the form-content of applications and responses, the interim rules provided that an application must contain all of the information upon which the applicant intended to rely in support of its proposal ("case-in-chief" format). Amendments that would change the scope of the

operating authority sought in the application ("restrictive amendments") were not permitted after the notice was published in the *Federal Register.*

As to the scheduled handling of licensing cases, the interim rules provided that the Commission would review an application for correctness and completeness and publish notice of the filing in the *Federal Register.* Persons wishing to oppose an application were to file protests within 45 days following the publication and such protests could include a request for oral hearings. Replies by the applicants to protests were due within 60 days of publication of the application in the *Federal Register.* In other words, an applicant had 15 days to reply to protests.

If an application was unopposed, a tentative grant would be published in the *Federal Register.* If an application was in fact opposed, the proceeding would be handled either on the written record alone or would be set for oral hearing.

### The Final Rules

Responding to the Commission's invitation to the public to make comments on the interim rules in preparation for final rules, many persons, including the petitioners here and certain of the intervenors, filed comments on the interim rules. After considering the comments received on the rules and its experience gained in using them for

---

the statutes affecting the Commission, including requiring expedited procedures, changing the entry standards for motor carriers of property, and redefining contract carriage of property by motor vehicle.

These statutory changes require a complete revision of present rule 49 C.F.R. 1100.247, the section which contains rules governing the application process. Changes in the pertinent application forms are also required, and corresponding technical revisions to 49 C.F.R. 1002, 49 C.F.R. 1003, 49 C.F.R. 1130 and 49 C.F.R. 1150 must be made.

\* \* \* \* \* \*

Because the procedural provisions were effective immediately and the Act went into effect upon enactment, we are publishing these as interim rules to be used until final rules are adopted. Comments are requested on the feasibility of these interim rules as final rules.

\* \* \* \* \* \*

DATES: Comments are due [45 days from date of publication in the Federal Register].

These rules are effective on an interim basis on [date of publication in the Federal Register], and govern applications filed on or after that date.

*Id.*

17. In the summary to the notice the Commission stated:

We propose to adopt the rules and application form set forth in Appendices A, B and C, and we will operate under these rules and the application form until further notice. We are receptive to comments on how these rules should be modified or whether some entirely different scheme of rules would function better. The suggestion of any alternative should specifically address how the proposal would work in view of the short time limits for processing applications.

*Id.* at 45539.

six months, the Commission issued a further decision modifying the interim rules, *Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 80109 (December 3, 1980) and subsequently adopted final Rules Governing Applications for Operating Authority. *Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 86771 (December 31, 1980). Applications filed on or after February 9, 1981, were affected by the new rules.

The final rules are substantially similar to the interim rules but contain some "minor" modifications. The modifications, according to the Commission, are to clarify the interim rules and to ease the paperwork burden on the public. Except in three particulars the relevant aspects of the interim rules, however, were retained. The final rules preclude amendments to an application *after filing,* rather than *after publication.* They eliminate the requirement that an applicant file financial information with its application. (The interim rules had prescribed that only the "fitness only" applications need not include the financial information.) The decision promulgating the final rules also specifically indicated that submission by an applicant of evidence of "operational feasibility" would not be mandatory.

### Petitioners' Attack

Petitioners protest that when the Commission published the Rules, it had neither previously given notice of proposed rules nor requested comment as required by § 553 of the APA. Further, the Commission's reasons for obviating notice and comment requirements were "vague and unconvincing at best."

Petitioners further argue that the changes which appeared in the final rules did not occur as a result of notice and comment efforts. And somewhat conversely they complain of the two changes in the interim rules as to which they had received no notice to comment before the final rules were promulgated. They assert that the elimination of the "financial fitness" requirement as a part of a motor carrier applicant's case is statutorily erroneous and of such substantive importance that notice and right to comment should have been provided.

The petitioners also contend that the total elimination of the necessity for presentation by the applicant of evidence of "operational feasibility" was made without proper notice and comment. As a sort of catch all they contend that what the Commission has labeled as "interim rules" were, in fact, "final rules" in the first instance because the final rules are "substantially similar" to the interim rules. Thus, the argument continues, the lost opportunity to comment upon the interim rules prior to their issuance made the Commission's invitation for comments hollow: by the time comments were solicited on the interim rules, the application rules were a *fait accompli.*

### In Defense of Rules

Briefly, but vigorously, the Commission upholds the rules. First, the Commission found and had good cause for not giving notice with advance opportunity to comment.[18] Second, the rules are procedural requiring no notice or comment.[19] Third, the rules substantively are in keeping with both the APA and the MCA.

### The Commission Had Good Cause

■ The critical question in determining the APA validity of the rules—save for substantive validity, discussed later—is whether the Commission had "good cause"

---

**18.** 5 U.S.C. § 553(b)(B) states in relevant part that notice and comment procedures are not required:

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

**19.** 5 U.S.C. § 553(b)(A) provides:

[T]his subsection does not apply—
(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice;

As stated at the outset, we find it unnecessary to reach this justification and express no opinion on it.

under § 553(b)(B), *see* note 18 *supra,* for not giving notice and opportunity for public comments on its interim rules. The Commission in its Notice of Interim Rules (July 3, 1981), found

> The Commission is faced with a situation in which the due and timely required execution of the agency functions would be prevented by undertaking a rulemaking proceeding prior to the adoption of any rules. Thus, notice and comment for these interim rules are not required under 5 U.S.C. 553(b)(A) and (B).

*Ex Parte* No. 55, (Sub-No. 43), 45 Fed.Reg. 45534, (July 3, 1980).

In our view, the statement regarding good cause was adequate. The procedural reforms mandated by section 25 of the MCA (*see* summary at note 15 *supra* ) required that *some* rules be instituted in order effectively to carry out the business of the Commission. The MCA became immediately effective and provided no transition period for developing new procedures to implement the significant legislative changes. Our decision that the Commission had good cause not to follow the notice and comment requirement of the APA is based on the fact that the Commission's promulgation of new rules was prompted by the radical revision of the Interstate Commerce Act. In its notice of interim rules and request for comments, the Commission emphasized that "the due and timely required execution of the agency functions would be prevented by undertaking a rulemaking proceeding prior to the adoption of any rules." *Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 45534 (July 3, 1981). The Commission stated in its Summary of the notice of interim rules and request for comments that the MCA had mandated several significant changes in the way motor carrier licensing proceedings were conducted, and, pursuant to those changes, it was required, among other things to alter the application forms, expedite procedures, and change entry standards.[20]

Keen insight is not required to realize the quandary that the Commission faced. It could not issue rules before the legislation took effect. It was already bogged down with an intolerable backlog of cases. Applications pending on the effective date of the MCA were to be processed under vastly different procedures than applications filed after the new legislation took effect. Pending applications were not to be handled under the relaxed MCA entry standards, 45 Fed.Reg. 45537; instead applications on file as of the effective date of the new legislation were to be handled under existing procedures and entry standards. *See Watkins Motor Lines, Inc. v. I.C.C.,* 641 F.2d 1183 (5th Cir.1981) *citing Corpus v. Estelle,* 605 F.2d 175, 180 (5th Cir.1979). It is obvious then that those parties with pending applications would expect the full panoply of procedural processes in effect prior to the MCA (i.e. oral hearings, restrictive amendments, duplication of application only to interested parties, and initial submission of overly broad applications).

Moreover, Congress anticipated that the new legislation with its relaxed entry standards would bring about more, not less, applications for operating authority. Obviously, regulations needed to be in place to handle this increased volume of applications. The House Committee on Public Works and Transportation predicted that "[w]ith the changes proposed by [the MCA] in [its] entry area, . . . a large number of new applications [would] be filed with the Commission." H.R.Rep. No. 1069, *supra* note 13 at 37 and 2319. It therefore declared "it is absolutely vital that the Commission be able to process the applications in a fair and expeditious manner. This section of the bill establishes new Commission hearing and appellate procedures to govern all nonrail cases in order to meet that goal." *Id.* at 37–38, 2319–20.

These two conditions (i.e., current backlog and future floodtide of cases) demonstrate the importance of the Commission having new rules in place immediately after the enactment of the MCA. Experience had proved that the existing procedures for pro-

---

**20.** *See* note 16, *supra.*

cessing applications nearly always resulted in delay. Without new interim rules, new applications filed during the period before final rules with notice and comment were promulgated would have to be considered under the old procedural rules creating even more delay. This would have frustrated Congress' intent to reduce regulatory lag and red tape.

Furthermore, without interim rules before the final rules took effect, the Commission would have been deprived of useful knowledge and experience gained in observing how alternative procedures worked under the new MCA while considering other methods suggested by the public comments to the interim rules.

It must be remembered that the old rules would be outmoded, because the MCA brought about significant changes in both substance and procedure. There was, first, the elimination of the traditional burden of an applicant to establish present or future public convenience and necessity. Now, after establishing that it is fit, willing, and able, the applicant proves only that the proposed service "will serve a useful public service, responsive to a public demand or need." H.R.Rep. No. 1069, *supra* note 13 at 14 and 2296; 49 U.S.C. § 10922(b)(1). What was the Commission to do with the expected flood of new entry applications? Was it to continue the use of old rules and old forms based on the traditional convenience and necessity structure? Or was it merely to mark time and do nothing until "final" final proposed rules were noticed and comment received?[21] And what would the ordered annual Congressional Oversight Committees[22] think of the new backlog of new applications backing up during such a 90 to 180 day period?[23] And what would happen to the Congressionally mandated deadline of 180 days for decision in a modified application?

The answers to these queries are obvious: to make the new Act effective and to achieve the goals set by Congress, it was imperative that the Commission, in order to adapt its processes to the new order, adopt almost immediately new rules and procedures with as much notice as was practicable. This it did by issuance of interim rules with invited public input before final regulations were issued.

Fortunately, courts uphold the exercise of such practical wisdom by regulatory agencies. For example, in *Council of the Southern Mountains Inc. v. Donovan,* 653 F.2d 573, 581 (D.C.Cir.1981), the Court found that good cause existed for the Secretary of Labor to dispense with notice and comment due to the imminence of the deadline for implementing regulations requiring coal operators to equip all underground miners with self-contained self-rescuers (SCSR's). Only two weeks before the final regulations were scheduled to take effect, the Secretary of Labor, without providing notice and comment, deferred implementation of the final regulations until June 21, 1981. The D.C. Circuit upheld the Secretary's action as reasonable and with good cause. *Id.* at 575.

Other cases have found good cause to exist for an agency to bypass notice and comment procedures and issue final or interim regulations. *See, National Federation of Federal Employees v. Devine,* 671 F.2d 607 (D.C.Cir.1982) (the office of personnel management had good cause to postpone the "open season" during which federal employees were permitted to transfer freely from one health benefit plan to another and to issue interim regulations without prior notice and comment); *Philadelphia Citizens in Action v. Schweiker,* 669

---

**21.** The APA contains only the 30 day minimum period, but considering the minimum 45 days for comments and 45 days for Commission action, counsel for petitioners on argument agreed that the time would be no less than 90 days, during which period nothing would be done on new applications (unless on outmoded rules and forms).

**22.** Section 3 of the MCA directed that oversight hearings were to be held no less frequently than annually to assure implementation of the Act. H.R.Rep. No. 1069, *supra,* note 13 at 11 and 2293.

**23.** *See* note 9 and related text. With 19,000 new applications per year the backlog E plus 90 would be 4800.

F.2d 877 (3d Cir.1982) (enactment of statute 49 days before the scheduled effective date provided the Department of Health and Human Services with good cause for avoiding notice and comment procedures in promulgating interim regulations); *Northwest Airlines, Inc. v. Goldschmidt,* 645 F.2d 1309 (8th Cir.1981) (imminent airline guide publication date justified abbreviated notice and comment processes for urgent Federal Aviation Administration regulation); *American Federation of Government Employees, AFL–CIO v. Block,* 655 F.2d 1153 (D.C.Cir. 1981) (sudden need for new regulations pursuant to court injunction, where regulations provide necessary guidance to poultry industry and serious economic harm would result from absence of guidance constituted good cause); *Texaco, Inc. v. Federal Energy Administration,* 531 F.2d 1071, 1083 (Em. App.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976) (compelling situation justified making regulations effective immediately); *Nader v. Sawhill,* 514 F.2d 1064 (Em.App.1975) (cost of living council had good cause to dispense with notice/comment where notice of crude oil price increases would have affected sales and deliveries adversely during a difficult period of supply); *Arizona State Department of Public Welfare v. Department of Health, Education and Welfare,* 449 F.2d 456, 481 (9th Cir.1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972) (HEW had good cause to issue AFDC regulations without notice and comment because of the need to provide guidance prior to imminent hearings).

Nor do the cases pressed by petitioners compel a contrary result. They direct us to several decisions which state that section 553 of the APA should be narrowly construed.[24] This Court has always been mindful of this admonition, *United States Steel v. EPA,* 595 F.2d 207, 214 (5th Cir.1979), and recognizes that the good cause exception "is an important safety valve to be used where delay would do real harm." *Id.*

In *United States Steel Corp. v. EPA,* 595 F.2d 207 (5th Cir.1979), we disapproved of the EPA administrator's action in designating certain areas in the State of Alabama as nonattainment areas for suspended particulate pollution without first complying with the notice and comment requirements of the APA.

In rejecting the contention of good cause, we stated:

> In short the Agency has simply failed to show strong enough reason to invoke the § 553(b)(B) exception. This exception should be read narrowly. *American Iron and Steel Institute v. EPA, supra,* 568 F.2d at 292. It is an important safety valve to be used where delay would do real harm.[15]

\*   \*   \*   \*   \*   \*

[15] Use of the exception has repeatedly been approved, for example, in cases involving government price controls, because of the market distortions caused by the announcement of future controls. *See De Rieux v. Five Smiths, Inc.,* 499 F.2d 1321, 1332 (TECA), *cert. denied,* 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *Nader v. Sawhill,* 514 F.2d 1064, 1068 (TECA 1975). The exception was also held applicable to regulations concerning gas stations, where temporary shortages and discriminatory practices were found to have deprived some users of any supply and led to violence. *Reeves v. Simon,* 507 F.2d 455, 458–59 (TECA 1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975).

595 F.2d at 214 & n. 15. Although short deadlines alone are not enough, the Court made clear that the test is one of impracticability—which means analysis in practical terms of the particular statutory-agency setting and the reasons why agency action could not await notice and comment.

But the mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute

24. *See e.g., State of New Jersey v. Environmental Protection Agency,* 626 F.2d 1038, 1045 (D.C.Cir.1980); *United States Steel Corp. v. Environmental Protection Agency,* 595 F.2d 207, 214 (5th Cir.1979), *reh'g granted,* 598 F.2d 915 (5th Cir.1979); *Sharon Steel Corp. v. Environmental Protection Agency,* 597 F.2d 377, 379 (3d Cir.1979); *National Nutritional Foods Association v. Kennedy,* 572 F.2d 377 (2d Cir. 1978); *American Iron and Steel Institute v. Environmental Protection Agency,* 568 F.2d 284, 292 (3d Cir.1977); *see also United States Steel Corp. v. Environmental Protection Agency,* 649 F.2d 572, 575 (8th Cir.1981).

good cause for a § 553(b)(B) exception. *American Iron and Steel Institute v. EPA,* 568 F.2d 284, 292 (CA3, 1977); *Shell Oil Co. v. FEA,* 527 F.2d 1243, 1248 (TECA 1975). The deadline is a factor to be considered, but the agency must still show the impracticability of affording notice and comment.

595 F.2d at 213. As an illustration of the analytical process the Court then pointed out steps or things the agency could have taken or done which it did not do which would have alleviated the shortness of time.

> Here, for example, the EPA gives no explanation of why it could not at least have published the AAPCC's initial list upon receipt and accepted comments during the time it was reviewing the list. This would have afforded petitioners some warning of the imminent designations and allowed them opportunity to influence the agency's action.

*Id.*

In these steel cases (each involved the same issue but different geographic areas), the EPA was operating under a statutorily imposed deadline to promulgate lists of non-attainment areas.[25] *Without notice and pre-promulgation comments* the EPA issued its *final* designations. Its "good cause" justification for doing so was the statutorily imposed deadline for action. We rejected this contention by observing that "[the] mere existence of deadlines for action ... does not in itself constitute good cause...." *U.S. Steel v. EPA,* 595 F.2d at 213. The D.C. Circuit's decision in *State of New Jersey v. EPA, supra,* followed ours; and the Third Circuit's decision in *Sharon Steel v. EPA, supra,* preceded ours by a few days. *Contra United States Steel Corp. v. EPA,* 605 F.2d 283 (7th Cir.1979) and *Republic Steel Corp. v. Costle,* 621 F.2d 797 (6th Cir.1980). The courts there stated that a statutorily imposed deadline represents good cause. *E.g., United States Steel v.*

*EPA,* 605 F.2d at 287 ("[t]he 'good cause' exception may be utilized to comply with the rigors of a tight statutory schedule"), *citing Clay Broadcasting Corp. v. United States,* 464 F.2d 1313 (5th Cir.1972), *rev'd on other grounds sub nom. National Cable Television Assn, Inc. v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974).

These steel cases and other supporting cases are unlike our situation here. In enacting the Clean Air Act, the Congress recognized the importance of making sure that "the air Americans breathe be clean," *State of New Jersey,* 626 F.2d at 1040, and directed the EPA to set air quality standards lest the "non-attainment of air quality standards in a wide and densely populated region ... result in a phenomenal health impact, measured in terms of millions of days of aggravated disease, asthma attacks and lower respiratory disease episodes." *Id. citing* H.R.Rep. No. 95–294, 95th Cong., 1st Sess. 209, *reprinted in* 1977 U.S.Code and Cong. & Ad.News 1077, 1288. Indeed, the regions which were designated "non-attainment" would face more stringent measures than those not so designated.

The states relied on the agency's designations in preparing their several plans to submit to the EPA to meet air quality standards imposed by the Clean Air Act. The EPA was vested with power to approve or disapprove of the state's plans. If a state's plan was rejected, then the statute forbade the construction or modification of any facility in the area "when the emissions from such facility will cause or contribute to concentrations of any pollutant for which [an air quality standard] is exceeded." 42 U.S.C. § 7410(a)(2)(I) (Supp. I 1977).

The statute set a deadline in which the EPA was to submit its list of designations for the benefit of the states in preparing their plans. Even after missing the statu-

---

**25.** The substantive issue undergirding the litigation in these steel cases related to § 107(d) of the Clean Air Act, 42 U.S.C. § 7407(d). The particulate levels in the designated areas exceeded the national primary ambient air quality standards as set by the EPA under 42 U.S.C.

§ 7409. As a result, a state could use the designations as one factor to be taken into account in developing its state implementation plan to attain the primary standards enunciated in 42 U.S.C. §§ 7410 and 7502.

tory deadline by a full month, the EPA never solicited comments from the business public affected by the designations, which would have obvious and enormous substantive impact on the states and private industry.

An even greater distinction of the steel cases from our case is that the EPA never promulgated "proposed" designations nor solicited comments on the feasibility of the "proposed" designations as final designations. That this fact was significant is evidenced by our opinion: "The same guidance that was accomplished by the EPA's procedures could have been accomplished by issuing a proposed list ... followed by final promulgation after notice and comment." 595 F.2d at 214. In remanding, we specifically directed the EPA to give notice of the proposed designations and solicit comments before promulgating its final rules. *Id.* at 215. In *State of New Jersey, supra,* the D.C. Circuit agreed: "The Administrator could have reconciled the commands of the two acts [the APA and the Clean Air Act] by publishing the designations submitted to him by the states as *proposed* rules." 626 F.2d at 1047 (emphasis added). In *Sharon Steel,* the Third Circuit concurred that this solution would have been an acceptable remedial measure. 597 F.2d at 380.

Finally, *National Nutritional Foods Association v. Kennedy,* 572 F.2d 377 (2d Cir. 1978), and *American Iron and Steel Institute v. Environmental Protection Agency,* 568 F.2d 284 (3d Cir.1977), are distinguishable from this case. In *National Nutritional Foods,* the Food and Drug Administration had published final *substantive* rules without any effort whatsoever to solicit comment on them. The FDA Commissioner unilaterally decided to ignore notice and comment procedures because he had determined that the public had "nothing more ... to say" since Congress had spoken in a contemporaneous legislative enactment. *Id.* at 385.

That case involved the sustained efforts of the FDA to achieve better control of the identity and labeling of vitamins and mineral preparations. The regulations had been in the making for over fourteen years inside the FDA and had seen considerable legislative struggle. Thus, Judge Friendly, with considerable restraint, concluded "there was no basis for the Commissioner [to] believe that the public would not be 'particularly interested' in his next move." *Id.*

Unlike that case, the Commission here expressly recognized that it would benefit from public comments on its proposed interim rules. It solicited comments on the proposed interim rules to be received before it promulgated its final rules.

In *American Iron and Steel Institute, supra,* the EPA had promulgated "interim *final*" substantive regulations without providing opportunity for comment on substantial revisions from the proposed rules. The EPA merely indicated that it would consider petitions for reconsideration of permits issued under those regulations *if* the "final" regulations were substantially different. It is thus unlike our case where the Commission specifically requested comment on the proposed rules without regard to whether or not they would differ from the final rules. The Commission thus pointedly sought the input of the public before it promulgated the final rules.

The upshot is that, supported by adequate precedent and not inhibited by controlling precedent to the contrary, the Commission could properly find that there was good cause for finding that giving notice with opportunity to comment before the issuance of the interim rules was "impracticable, unnecessary, or contrary to the public interest." § 553(b)(B).

### Substantive Attack on the Rules

Although it is likely that several of the petitioners' attacks on some specific rules are centered on the contention that they were really not exempt from the APA's procedural rules because of the *Brown* adverse impact, we address each of the contentions as though each was a claim that substantively the rule was invalid. As near as we can discern, the attacks are directed at:

■ the case in chief format,

(ii) the elimination of restrictive amendments,

(iii) the restricted use of oral hearings in the application process,

(iv) the requirement that an applicant furnish copies of its complete application to anyone who requests it,

(v) the allocation of time between the parties to prepare and to present their case and the Commission to render its decision as exalting agency convenience above the parties' need for adequate case preparation time in violation of § 554(b), and

(vi) the deletion of "financial fitness" and "operational feasibility" from the final rules as substantially improper and, in any event, made without proper notice.

As our review concluded that the manner of promulgation of the rules satisfies the APA, we must next determine the standard for review of the substantive validity of the rules.

■ We start with the decisive fact that authority to promulgate regulations was expressly conferred on the Commission.[26] Courts have traditionally recognized that "When an agency exercises authority expressly delegated to it by Congress it is at the zenith of its powers. Its regulations are entitled to 'more than mere deference or weight.'" *American Trucking Association, Inc. v. United States,* 627 F.2d at 1320 (D.C. Cir.1980) *quoting Batterton v. Francis,* 432 U.S. 416 at 426, 97 S.Ct. 2399 at 2406, 53 L.Ed.2d 448 at 457 (1977); *Udall v. Tallman,* 380 U.S. 1 at 16, 85 S.Ct. 792 at 801, 13 L.Ed.2d 616 at 625 (1965).

■ As a consequence, the scope of our review of the agency action in adopting these final rules is constricted. We are empowered to set aside the final application rules only if they are "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976); *see also* 2 K. Davis, Administrative Law Treatise §§ 7:8–7:12 (2d ed. 1979). Because our role is a limited one, we have held elsewhere that our review of agency action is "not to be exercised with the zeal of a pendantic schoolmaster who grades papers for a single correct answer, but with the respect that is due responsible and experienced government officials themselves charged with duties of national importance." *Western Coal Traffic League v. United States,* 694 F.2d 378, 383 (5th Cir. 1982) (en banc pending).

■ We must now address the specific attacks on the substantive validity of the rules.

### (i) Case in Chief Format

The protestants first challenge the validity of the case in chief format.

The new application rules require applicants to file their complete evidentiary cases with their applications for new authority. Such a filing is done before the identity or interest of opposing carriers is known. This new approach is known as the "case-in-chief" method. Its adoption represents a marked departure from the Commission's former procedures for filing an application prior to the interim rules.

Under the old procedure, an applicant was not required to submit its initial evidence in any contested case prior to knowing the identity and interest of those in opposition. Hence, an applicant could prepare and present its evidence to meet the issues raised by the opposition. The case-in-chief filing methodology eliminates or reduces this opportunity. The petitioners argue that since under the new rule an applicant cannot adduce any new evidence in its reply statement, it can never prepare and present evidence bearing upon its opposition beyond that which rebuts evidence offered

---

**26.** 49 U.S.C. § 10321(a) provides:
The Interstate Commerce Commission shall carry out this subtitle. Enumeration of a power of the Commission in this subtitle does not exclude another power the Commission

may have in carrying out this subtitle. The Commission may prescribe regulations in carrying out this subtitle.
*See also* § 10922(i)(1)(2) as to regulations in certain specific situations.

by an opposing party. We agree that the case-in-chief approach is substantially different from the old procedure.[27]

The Commission's requirement that an applicant present its entire case prior to hearing from protestants is an idea whose time had come. One need only examine the former procedures used by the Commission before advent of the new method to know that the Commission could conclude that the "case-in-chief" format serves a very useful purpose in reducing the familiar long delays in processing applications.[28] The rule is a long way from being arbitrary or capricious and, in any event is open to continuous review.[29]

*(ii) Elimination of Restrictive Amendment*

Under the new rules the Commission placed a ban on restrictive amendments. Under the former practice an application could be restrictively amended by the applicant any time after its initial filing. Under the new rules, restrictive amendments

which change the scope of the authority sought after the application is filed will not be permitted.

In effect, an application cannot be restrictively amended after an applicant learns the identity and interest of those who oppose its application. The petitioners thus argue that the parties are locked into litigation which has historically been settled and avoided. Restrictive amendments, so they urge, have been utilized to eliminate unnecessary litigation, reduce the time and expense of all parties and the Commission, expedite final disposition of cases, protect the legitimate interests of existing carriers, and conform the authority requested to the scope of the public support to be presented.

In our view, prohibiting restrictive amendments eliminates the prospect of great delay. Moreover, the practice is fully consistent with both the legislative history of the MCA and with the MCA provisions relating to expedition of the application process and elimination of unreasonable ter-

**27.** Protestants urge that the change is significant in light of a prior Commission decision rejecting the case-in-chief approach. *See Revision of Application Forms,* 125 M.C.C. 790 (1976). The Commission found that the case-in-chief format would not then be feasible and might increase the litigation costs of an applicant. *Id.* at 818–20. The Commission in *Ex Parte* No. 55 (Sub-No. 43) p. 5, note 1 explained the differences in the feasibility of the "case-in-chief" format rejected in *Revision of Application Forms, supra,* from the present use of a similar format:

> The major objections of the Commission against adoption were (1) applicant would face increased costs since it would have to serve copies of its evidence on all parties who submitted "protests" (not including protestants' verified statements, however); and (2) applicant's inability to discover existing services, linked with its burden of proof to meet the second part of the three-part test in *Pan-American Bus Lines Operations,* 1 M.C.C. 190, 203 (1936).
>
> These objections have been removed, since an applicant no longer has the "adequacy of existing service" burden of proof. Further, our different version of case-in-chief requires the opposition to file its entire case, which makes frivolous protests unlikely. Applicant is partially remunerated for copying costs in our rules. Finally, all choices of an applicant system require compromises and trade-offs.

> The 180-day time limit cannot, however, be compromised.

**28.** For the reasons stated by the Commission as to the time frame, see item (v), *infra.*

> A number of parties object to the "case-in-chief" format.[1] A basic objection is the belief that the time limits imposed by 49 U.S.C. 10322 can be met by more expedited internal handling and a restructuring of times when statements are due.
>
> We find none of the many submitted alternatives suitable. In each instance, times for the numerous steps which composed the former procedures are so compressed as to be unworkable.
>
> Our experience since July has been favorable. By and large, private parties have met the timetables we established on an interim basis and we have been able to meet the statutory deadlines in all cases to date.
>
> *Ex Parte* 55 (Sub-No. 43) p. 5, 6.

**29.** The Commission stated:

> Our procedures, moreover, are not set in stone. We are prepared to review them in light of the experience gained over the next several months in order to determine whether (i) the time available to private parties is sufficient, and (ii) the time allowed for decisionmaking at the Commission is unnecessarily long. We can adjust the allocation of time if circumstances warrant.

ritorial and commodity restrictions. Experience bore out that under former procedures, protestants to applications were given an opportunity and incentive to coerce applicants to reduce their requests for operating authority. Frequently, a protestant was bereft of sufficient evidence to maintain a position, but the mere appearance of a protestant in the case convinced the applicant to narrow the request for authority. The elimination of restrictive amendments solved this problem.

The Commission fully considered comments made by several agencies and persons voicing objection to the elimination of restrictive amendment opportunities. In response, the Commission pointed out that negotiations between applicants and protestants regarding restrictive amendments distorts the public interest aspect of the licensing process.[30] We consider this view to be not only reasonable but accurate.

We also have considered the petitioners' argument that the elimination of the opportunity to restrictively amend an application runs counter to the settlement provisions of the APA.[31] The Commission pointed out that the legislative history of the APA reflects that where, "any agency believes that the informal settlement will not accomplish the ultimate purpose of the proceeding, such as future compliance with the law, it

would be justified in concluding that settlement by consent would not be in the public interest." *Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 86775 (December 31, 1980). Viewed from this angle, the Commission's decision that restrictive amendments would not be within the public interest is certainly reasonable. We agree with the Commission that the restrictive amendment process compromises the goals of eliminating unnecessary restrictions, gateways, and circuitous routes, has built in anticompetitive risks which thwart the congressional goal of regulation by competitive forces of the market place, and is contrary to the public interest.

The Commission sums it up well: "Competition is generally presumed to be in the public interest, not contrary to it." *Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 86775 (December 31, 1980). *Cf. Federal Communications Commission v. WNCN Listeners Guild,* 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521, 535 (1981) ("Our opinions have repeatedly emphasized that the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference.")

### (iii) Restricted Oral Hearings

Petitioners claim that under the new procedure oral hearings will be "virtually elim-

---

*Ex Parte* No. 55 (Sub-No. 43) p. 6.

**30.** The Commission stated:

In a motor common carrier of property case, once [an] applicant carries its threshold burden, the burden of proof shifts. In other words, once the application is published, the Commission has preliminarily determined that the burden has shifted, and has found that the proposed service will serve a useful public purpose, responsive to a public demand or need. At that point, the restrictive amendment process serves no public interest purpose. It is up to protestants to present substantial evidence to meet their burden of evidence and proof. While the determination of the threshold case is subject to reexamination, there is less reason, as a practical matter, for the applicant to accede to a request for a restrictive amendment, since, without a substantial evidentiary showing by protestants, it will have won its case.

\* \* \* \* \* \*

... [w]e stress that Congress has entrusted the Commission to analyze evidence and arrive at a correct assessment as to the needs

for additional service or competition, including whether an application should be only partially granted. The restrictive amendment process in actuality distorts this reasoned analysis, because it encourages protesting parties to coerce an applicant to accepting a fragmented grant of authority when the applicant is willing to offer the public a broader service.

*Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 86774 (December 31, 1980).

**31.** Section 554(c) provides, in relevant part:

(c) The agency shall give all interested parties opportunity for:

(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and

(2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.

inated". They come to this rather dubious conclusion on the basis of the Commission's statement that it "anticipate[d] that almost all cases will be handled under modified procedure." This statement was taken from *Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 86777 (December 31, 1980). The petitioners contend that this new procedure "leaves doubt as to when, if at all, oral hearings will be held." Prior Commission procedures had seen 12–15% of all motor carrier applications set for oral hearing. Under the modified procedure, an appellant who believes that a hearing should be had on its application because of the significance of the case or the material issues that are in dispute may still request an oral hearing. The Commission points out that hearings will be allowed only in extraordinary cases or in cases where the factual issues are complex.

What the petitioners' contention amounts to is that the Commission's statement that it will only grant oral hearings in extraordinary cases equals total elimination of oral hearings. The Commission did not state this. The Commission stated only that oral hearings will be conducted in those cases where the record is complex and material facts are in dispute.

The Commission's decision to limit oral hearings to extraordinary cases is valid. When cases do not merit an oral hearing we see no reason why the Commission is required to grant one.[32] The APA does not require that an agency grant an oral hearing. A party may present evidence by written submissions. *See* 5 U.S.C. § 556(d). The Commission's modified procedure has been considered by other courts and has been viewed as fundamentally fair. *Eastern Oil Transport, Inc. v. United States,* 413 F.Supp. 121 (E.D.N.C.1976); *Frozen Foods Express, Inc. v. United States,* 346 F.Supp. 254 (W.D.Tex.1972); *Howard Hall Co. v.*

*United States,* 332 F.Supp. 1076 (N.D.Ala. 1971); *Allied Van Lines Co. v. United States,* 303 F.Supp. 742 (Cal.1969); *Cf. Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950).

■ Certainly, the APA recognizes that a party is entitled to present its case either by oral or by documentary evidence. *See* 5 U.S.C. § 556(d). An agency is not *required* to provide oral hearings. Oral hearings are compulsory only when the statute governing the agency's actions make an oral hearing mandatory. *See Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950). The Commission itself has never found oral hearings to be mandatory in application proceedings. *See King Pak, Inc. Investigations of Operations,* 103 M.C.C. 319, 344 (1966). *See also Theatres Service Co.,* 113 M.C.C. 744, 746–47 (1971) (no oral hearing required in the case of an application that might otherwise be sent to a joint board).

Moreover, the Commission recognizes that the legislative history of the MCA reflected a congressional expectation that the number of oral hearings might be significantly curtailed. *See* remarks of Senator Cannon: "we expect the end of long delays, the end of narrowly granted authority, the end of expensive litigation, *the end of virtually all oral hearings,* the end of frivolous protests, and the beginning of a new era in which those who feel that they have a service to offer to the public have an opportunity to do so." (emphasis added). 126 Cong.Rec. 57685 (1980).

This opportunity is especially available in motor carrier applications since, with new entry standards, the most pertinent criteria is whether the application for motor carrier service will serve a "useful public purpose." The new application forms were developed to elicit this information. Their use in an applicant's case-in-chief, coupled with pro-

---

**32.** Granting oral hearings in only those cases in which the issues warrant it is a commonly used practice in this Court, *see* Fifth Circuit Local Rule 34. Our circuit long ago established the practice of deciding cases on the summary calendar (without oral argument). *See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New*

*York,* 431 F.2d 409 (5th Cir.1970). From 1968 to June 30, 1981 we screened 23,537 cases of which 50.6% were disposed of without oral argument. Since then down to June 30, 1983, we have screened an additional 2,930 cases with 53.2% being handled without oral argument.

test procedures streamlined to eliminate unmeritorious protests and restrictive amendments, would render oral hearings necessary in only a small percentage of cases.

We think that the use of oral hearings for only the most significant of cases is appropriate and the new rule is valid.

### (iv) Furnishing Copies to Requesting Persons

The new rules require that, upon request, an applicant is to furnish to any person requesting it a copy of its entire application for which the requester is to pay a $10.00 fee to help defray reproduction and mailing costs. Under the former procedures, an applicant was only required to furnish a copy of its application and evidence to a party who had filed a protest.

Considering the substantive change requiring the filing and publication of the initial application before the identity or interest of potential protestors is known, this procedure was amply within the Commission's discretion. The attack is, or at least borders on, frivolous.

### (v) Limited Time Exalts Agency Convenience over Needs of Parties

Some of the protestant-intervenors urge that the allocation of time between the parties to prepare and to present their case and the Commission to render its decision exalts agency convenience above the need of the parties for adequate case preparation time in violation of § 554(b) of the APA.

We have considered this contention and find it devoid of merit.

The Commission, under repeated congressional admonitions to speed up the process, had to determine how best to allocate the limited time period provided by the MCA, see 49 U.S.C. § 10322, between the agency and the public it served to exercise their various roles.

Seeking to parlay the Commission's determinations into some kind of a due process violation and an abridgement of the APA, the intervenors-protestants argue that the time allocation between the Commission and parties is inadequate and unfair to litigants before the Commission. This argument is without merit. An applicant, of course, has no constraints on how much time it can take to draft its application for operating authority. A protestant, on the other hand, must file its protest within 45 days after notice of the application appears in the *Federal Register*. As the Commission notes, this constitutes 25% of the total time in the initial decision stage of the application process. After a protestant has filed its protest, an applicant then has 15 days to reply. We do not consider this time allotment insufficient.[33]

As to the broader challenge of time allocation and the case-in-chief format couched in terms of unfairness and denial of due process, it amounts to an assertion that the Commission, in effect, should retain its current licensing procedures. The Commission adequately disposed of these attacks.[34] We

---

**33.** With respect to the 45 day deadline to file protesting response, this Commission statement is persuasive:

> First, protestants are not operating from 'scratch' when they see an application in the Federal Register. Many protestants have developed their traffic data representations so that they can readily extract such information. And, while an applicant has to do original research on its application, protestants have a finite, known body of financial and operations data with which to work. Many of the items supplied by the protestant do not change from case-to-case, e.g., service capabilities, equipment lists, etc.

*Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 86772 (December 31, 1980).

**34.** The Commission stated:

> [These] contentions, in fact, go not to the notice requirements of the APA, but rather to the fairness of the procedures adopted. An applicant is entitled to file an answer or other form of responsive pleading, and the Commission's rules so provide,[7] but an applicant is not "entitled" to know the protestant's anticipated contentions before submitting initial evidence. While it might be marginally helpful to an applicant to be knowledgeable of the issues protestants intend to raise, before submitting its evidence in support of the application, applicant is entitled under section 554 only to a "response" to protestants' pleadings.
>
> Commission regulations provide for the filing by applicant of a reply to any protests, ensuring that applicant is given the opportu-

think the Commission had, and expressed, an ample refutation.

### (vi) Deletion of "Financial Fitness" and "Operational Feasibility" from Final Rules

Petitioners argue that without proper notice and comment the Commission made changes from the interim rules by deleting from the final rules, the requirement that an applicant submit data to prove "financial fitness" and evidence relating to "operational feasibility". There are two aspects of this challenge (i) the procedural propriety of the change, and (ii) the substantive intrinsic merits of the changes.

### Procedural Correctness

The Commission correctly points out that it promulgated the interim rules with a specific proviso that *comments were requested on the feasibility of the interim rules as a basis for final rules.* In the Summary of the notice of interim rules, the Commission stated we "are receptive to comments on how these rules should be modified or *whether some entirely different scheme of rules would function better.*" Ex Parte No. 55 (Sub-No. 43), 45 Fed.Reg. 45539 (July 3, 1980).

■ The proper test is whether the notice would fairly apprise interested persons of the subjects and issues the agency was considering. *E.g., American Iron & Steel Institute v. E.P.A.,* 568 F.2d at 293; *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 632 n. 51 (D.C.Cir.1973). The notice need not specifically identify "every

precise proposal which [the agency] may ultimately adopt as a rule." *Action on Children's Television v. Federal Communications Commission,* 564 F.2d 458, 470 (D.C. Cir.1977), *quoting California Citizens Band Association v. United States,* 375 F.2d 43, 48 (9th Cir.), *cert. denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). This notice was adequate to apprise the public that the Commission was considering a complete revamping of the interim rules and comments on any of their aspects were welcome. The Commission was therefore procedurally justified to make changes in any of the interim rules.

■ The agency may adopt a new rule which is different, even one containing substantial differences from the one proposed and still have acted lawfully. *International Harvester, supra.* Again, we regard the notice given as adequate. Petitioners' and intervenors' protestations to the contrary are without merit and we reject them.

### Financial Fitness

■ We now address the substantive merits. The Commission's comments accompanying the final rules convince us that the deletion of a requirement that an applicant present data to prove "financial fitness" (balance sheet and income statement) is reasonable and within the discretion of the agency. The petitioners vigorously urge that this deletion was statutorily in error since the MCA requires that the applicant establish that it is "fit, willing, and able," § 10922(b)(1)(A), and the Commission

nity to sustain any issues in its application which protestants controvert.

We believe that "adequacy of existing service" is no longer a factor to be considered in determining whether a property motor carrier applicant has made a threshold case. Once having determined this, it is clear that these former objections to adoption of a case-in-chief approach are eliminated, since applicant will not have to prove something which is more fully within the knowledge of existing carriers.

It is clear that Congress has required us to go beyond the Commission's historic approach to entry, which included evaluating adequacy of existing service. Here, Congress

is stating that existing service may be perfectly adequate and recognizes that a new operation may draw traffic away from existing carriers, but nonetheless instructs us to grant applications unless public harm is shown. This is consistent with the House Report's language that increased competition and potential competition will bring about the best "delivery of transportation service to the public."[9] Thus, not only is adequacy of existing service not an issue in applicant's establishing a threshold case, but it is not a significant issue in the case at all.

*Ex Parte* No. 55 (Sub-No. 43) *reprinted in* 45 Fed.Reg. 86773 (December 31, 1980)

had "historically considered the financial fitness of an applicant." Ex Parte No. 55 (Sub-No. 43), 43 Fed.Reg. 86782 (December 31, 1980).

The Commission observed, as did several responding commentators that it had prescribed no requirement under the interim rules for an applicant in a "fitness only" application to provide financial information. The Commission felt the elimination of this requirement for other applicants was appropriate since this information served no useful purpose. Responding to comments from those who felt a "financial fitness" requirement indispensable, the Commission stated:

The Commission has never established a fixed, minimum dollar limitation as a prerequisite for a carrier's entry into the regulated trucking industry. We have recognized that many new entrants start small. In recent years we have adopted a standard that the financial fitness of an applicant is pertinent only in relation to whether it can adequately conduct the proposed operation. The question for resolution has been whether an applicant is sufficiently capitalized to undertake the specific operations it intends to conduct.

We can think of no substantial reason to continue this examination. In a more heavily regulated environment, where the regulatory agency rather than the market place was the prime guarantor of service, a policy that we wanted to ensure that an applicant could actually conduct the operation it was proposing may have had validity. Since the newly authorized carrier would soon be accorded the benefits of all the evidentiary presumptions which historically ran in its favor, it was reasonable that the new carrier should be required to uphold its part of the regulatory bargain, i.e., it would perform the operation as proposed.

*The basis for this policy no longer exists.* Under . . . the new Act, carriers are encouraged to tailor price and service options in such a way that the public will have greater choices. *The market place will ultimately determine the financial success of a proposed operation. At the same time, a financial failure would not translate into any long term service vacuums since our entry policies will permit the rapid replacement of carriers that fail.* This is not to say that we are unconcerned with the common carrier obligation and service to small shippers and communities.

We will continue to examine equipment availability, however, and an applicant will be required to describe its equipment, or how it would obtain equipment to perform the operation in the short run. . . .

\*        \*        \*        \*        \*        \*

We believe that with freer entry, carriers, in the absence of high regulatory barriers, will more willingly seek authority to serve less busy and perhaps less profitable areas.

*Ex Parte* No. 55 (Sub-No. 43), *reprinted in* 45 Fed.Reg. 86782 & n. 31 (December 31, 1980) (emphasis supplied). Furthermore, the Commission expressly stated that it remains "prepared to examine any financial activity which may bear on the carrier's treatment of its customers." *Id.* at 86783.

The Commission had to adapt its rules and operating procedures to the new order established by Congress which included an emphasis on maintaining service to small communities and small shippers and promoting greater participation by minorities in the motor carrier system. *See* 49 U.S.C. § 10101(a)(2)(E)(H).

In proving "financial fitness" under prior Commission practice an applicant submitted a current (or estimated, if not operating) balance sheet and income statement. The Commission recognized that this information alone could not paint the whole picture and its experience had shown that cold balance sheets and impersonal, non-descriptive income statements were unhelpful or misleading.

We are concerned that undue regulatory reliance on a carrier's unfavorable financial picture may unnecessarily block entry for many small companies. It is axiomatic that many small companies survive just on the basis of hard work, an

asset that cannot be portrayed in balance sheets. In other cases, additional authority is the very means by which a struggling company can reverse its financial fortunes.

Finally, we have great doubts about the past effectiveness of the financial fitness examination. Many carriers have received an affirmance of their overall fitness, including financial fitness, only to file bankruptcy petitions soon thereafter. The bankruptcy laws and the insurance requirement imposed on the carriers serve as adequate protection to the public. Our past examination has had little or no correlation to the ongoing ability of a company to survive.

*Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 86782–83 (December 31, 1980). The Commission concluded that the financial ability of an applicant to operate and provide safe, economic and efficient service to the public was more appropriately determined by the rigors and demands of the market place. The Congress reflected this approach, the Commission agreed, and so do we.

Faced squarely with the opportunity to goad the Commission for eliminating this requirement, we declined to do so. *Steere Tank Lines v. Interstate Commerce Commission,* 703 F.2d 927, 930 (5th Cir.1983).

### Operational Feasibility

Similar concerns prompt our unwillingness to disapprove the deletion of the requirement that an applicant present evidence relating to "operational feasibility". We observe parenthetically that the elimination is only of the *requirement* that an applicant present "operational feasibility" evidence. There is nothing about the final rules that preclude an applicant, if it chooses to do so, from presenting evidence on "operational feasibility". The Commission will certainly accept it.

We emphasize that the origin for this requirement stems from the Commission itself. This requirement was not judicially imposed and is not a statutory prerequisite to the issuance of a motor carrier authority. In a General Policy Statement issued November 15, 1973, the Commission required that an applicant present evidence respecting how equipment was expected to be returned to an origin point, as well as other data relating to the operational feasibility of the proposal, including the incidence of deadhead operations. 38 Fed.Reg. 32856.

In a subsequent policy statement, the Commission announced that the policy of requiring evidence of return movements was intended to be applied as an equitable factor toward the granting of applications where applicants show that efficient traffic movements on return were a part of their proposals. "[B]ut it was not intended to serve generally as a basis for denying an application where a need had been established for the proposed service, where backhaul traffic may have been unavailable, or where return traffic movements were otherwise not possible." *Ex Parte* No. 55 (Sub-No. 43), 45 Fed.Reg. 86780 (December 31, 1980).

In eliminating information on "operational feasibility" as a *requirement,* the Commission concluded that "[an] applicant may present such evidence in its application, but that this is not required, and to this extent we overrule the policy statement. We adhere to the line of cases [which hold] that submission of this evidence is permissive for the applicant. It can enhance an applicant's position, but other factors normally outweigh this factor." *Id.*

The Commission then explained at length how it arrived at the conclusion that operational feasibility would not be a decisive factor in an application proceeding.[35]

---

**35.** The Commission stated:

Giving significant weight to operational feasibility evidence would suggest that we can administratively allocate the productive use of resources better than the marketplace; that we can decide which carrier should transport certain percentages of the available traffic; and whether this will be done at the maximum efficiency. Stated differently, it assumes we can decide whether an applicant will operate exactly as it proposes, what response existing carriers will make (such as to compete more aggressively) and whether our powers of prediction are reliable in the long

## Conclusion

This case presents just the sort of "subordinate questions of procedure," *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 525, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 at 468 (1978) *quoting FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134 at 138, 60 S.Ct. 437 at 439, 84 L.Ed. 656 at 659 (1940), which ought be left to the informed discretion of the Commission. The final rules are not the sort of regulations which "run far afield from the specific substantive provisions of the act". *Central Forwarding, Inc. v. ICC,* 698 F.2d 1266, 1277 (5th Cir.1983). *See also* 5 U.S.C. § 706(2)(C) (1976).

The Commission stated reasons why it was adopting the new procedures. We find the Commission's actions undertaken here to be within the " 'zone of reasonableness,' " *Global Van Lines, Inc. v. ICC,* 627 F.2d 546, 552 (D.C.Cir.1980), *cert. denied* 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981), traditionally afforded an administrative agency in making procedural and policy determinations.

The new legislation called for the Commission to remove many unnecessary restrictions, to grant broader operating authority, and to ease entry barriers into the industry. A significant part of the new statute mandated widespread procedural reform.

The final regulations streamline the application procedure. They reduce paperwork burdens and unnecessary battles between applicants and protestors are avoided. These changes have brought about a reduction of the Commission's backlog and have resulted in a trucking industry in which many are quite satisfied.[36]

## PETITION DENIED.

---

term. We think that in most cases these assumptions are unfounded.

The new act gives recognition to this observation. Congress has now recognized that marketplace competition is the better allocation mechanism. Unless there are clear reasons in a specific case for believing that the marketplace will not produce the better results, we should not disturb that process.

The marketplace is dynamic. Carrier and shipper managements make decisions based on today's economic circumstances. Our review of the evidence is at best several months late. During this time, there are many options open to all parties for making their operations more efficient. An existing carrier, faced with the prospect of a new competitor, can lower prices and attract more business. It can seek additional authority from the Commission to ensure balanced operations. It can drop or rearrange service in the market area and put its resources to work where it can operate more efficiently.

What is most critical, from the administrative point of view, is that deciding cases using operational feasibility as a significant factor in every case results in a blunting of market incentives for existing carriers to reassess the efficiency of their existing operations; it further dulls the cutting edge of competition and its reinforcing tendency to let the most efficient operation rise to the top. In sum, a careful, calculated look at operational feasibility should only be used as a last resort, where we are suspicious that the marketplace allocation scheme is breaking down.

*Id.* This reasoning is sufficient to uphold the Commission's deleting the formal "operational feasibility" requirement. The Commission remains receptive to "operational feasibility" evidence from either an applicant or a protestant. It is within the Commission's discretion. This is especially so since the requirement stemmed from a general policy statement in 38 Fed.Reg. 32865 (1973), which the Commission in the light of the new legislation and its experience could modify or reject. *Central Freight Lines, Inc. v. United States,* 669 F.2d 1063, 1071 (5th Cir.1982) flatly governs the petitioner's argument. There, we expressed agreement

with the Commission's reasoning in *Ex Parte* No. 55 (Sub-No. 43), especially in light of the new law's purpose to 'offer increased opportunities for new carriers to get into the trucking business and for existing carriers to expand their services.' ... A full analysis of operational feasibility in every case would inhibit this new statutory purpose. In fact, operational feasibility was not a statutory requirement even under the old law.... The Commission, in response to the new statute, has decided to alter this policy. We cannot say that the Commission should not have done so....

*Id.* at 1071 (citations omitted).

**36.** See, for example:

Many carriers ... like the idea that their business decisions are no longer subject to second guessing and red tape in Washington. Before passage of the Motor Carrier Act, there was a chronic backlog of over 15,000 applications for permanent motor carrier op-

erating authority and almost 4,000 applications for temporary authority pending before the Commission. That backlog has been completely eliminated.... [T]he Motor Carrier Act ... imposed strict statutory deadlines on the handling of various categories of cases. There has been nearly perfect compliance with those deadlines. In the absence of some extraordinary circumstances, carriers routinely receive regulatory approvals. In short, carriers have come to expect prompt and favorable treatment from the ICC to test new markets, adjust their prices, or experiment with new services.
The Strategy of Regulatory Change, 49 I.C.C. Prac.J. 634.